

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00200-CR

EX PARTE JAMES OLIVER MELLO III

----------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

----------

## OPINION ON PETITION FOR DISCRETIONARY REVIEW

----------

### I. Introduction

Pursuant to former rule of appellate procedure 50, we withdraw our June 30, 2011 opinion and judgment and substitute the following.[1]  *See* Order Amending Texas Rules of Appellate Procedure, 74 Tex. B.J. 763 (Tex. Crim. App. effective Sept. 1, 2011).

---

[1]Because the petition for discretionary review was filed on August 30, 2011, before rule 50 was abolished effective September 1, 2011, that former rule still applies to this appeal.

James Oliver Mello III appeals from the denial of his article 11.072 post-conviction application for writ of habeas corpus. In one point, Mello challenges the habeas court's conclusion (and supporting findings) that Mello failed to prove he is actually innocent. Because the habeas court did not abuse its discretion in denying habeas relief, we affirm.

## II. Procedural Background

On September 23, 1994, Mello pleaded guilty pursuant to a plea agreement to the second-degree felony offense of indecency with a child by contact. *See* Act of June 19, 1987, 70th Leg., R.S., ch. 1028, § 1, 1984 Tex. Gen. Laws 3473, 3473 (amended 2009) (current version at Tex. Penal Code Ann. § 21.11 (West 2011)). In accordance with the agreement, the trial court deferred a finding of guilt and placed Mello on community supervision for three years (and subsequently added an additional year). Mello was released from community supervision on November 19, 1998. Mello did not appeal or otherwise challenge the granting of deferred adjudication until filing his June 15, 2009 application for writ of habeas corpus pursuant to article 11.072 of the code of criminal procedure.[2] *See* Tex. Code Crim. Proc. Ann. art. 11.072 (West 2005).

---

[2]*See* Tex. Code Crim. Proc. Ann. art. 11.072, § 1 (providing that this article establishes the procedures for an applicant to seek habeas corpus relief "from an order or a judgment of conviction ordering community supervision"); *Ex parte Hiracheta*, 307 S.W.3d 323, 325 (Tex. Crim. App. 2010); *Ex parte Cummins*, 169 S.W.3d 752, 756 (Tex. App.—Fort Worth 2005, no pet.); *see also Ex parte Enriquez*, 227 S.W.3d 779, 781–83 (Tex. App.—El Paso 2005, pet. ref'd) (concluding that trial court had jurisdiction to consider habeas corpus application

In his article 11.072 habeas application, Mello asserted that newly discovered evidence established that he was actually innocent of the indecency with a child offense for which he was placed on deferred adjudication community supervision.[3] The State filed a response in opposition. On January 22, 2010, the judge presiding over the habeas proceeding ("habeas court") held an evidentiary hearing.[4] After both sides filed proposed findings and conclusions, the habeas court entered findings of fact and conclusions of law and denied Mello's request for relief on May 19, 2010.

## III. Analysis

In one point, Mello asserts that the habeas court abused its discretion by denying his post-conviction habeas application.[5]

---

filed by defendant who had been discharged from deferred adjudication community supervision).

[3]Mello challenged the legality of the trial court's order deferring adjudication and imposing community supervision. *See* Tex. Code Crim. Proc. Ann. art. 11.072, § 2(b)(1). Mello asserted that, even though he has been discharged from community supervision, he continues to suffer from illegal restraint by the State—e.g., being registered as a sex offender (a condition of his community supervision)—which has "caused him significant problems in his life, including employment issues." Mello asserts this same argument in his appellate brief.

[4]The habeas judge was not the same judge who imposed Mello's deferred adjudication community supervision.

[5]An applicant may appeal the denial of an article 11.072 application. Tex. Code Crim. Proc. Ann. art. 11.072, § 8; *Ex parte Villanueva*, 252 S.W.3d 391, 396–97 (Tex. Crim. App. 2008).

3

## A. Applicable Law

### 1. Actual Innocence

Mello raises a "*Herrera* claim"[6]—e.g., "a substantive claim in which the person asserts a 'bare claim of innocence' based solely on newly discovered evidence."[7]  *Ex parte Brown*, 205 S.W.3d 538, 544 (Tex. Crim. App. 2006). Claims of actual innocence based on newly discovered evidence are cognizable on post-conviction writs of habeas corpus.[8]  *Ex parte Brown*, 205 S.W.3d at 544 (citing *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996)).  An applicant who pleaded guilty can later bring an actual innocence claim based on newly discovered evidence.[9]  *Ex parte Brown*, 205 S.W.3d at 544 (citing *Ex parte*

---

[6]*Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993).

[7]Texas courts recognize two types of innocence claims, the second of which is a "*Schlup* claim"—e.g., "a procedural claim in which applicant's claim of innocence does not provide a basis for relief, but is tied to a showing of constitutional error at trial."  *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 314, 115 S. Ct. 851, 860 (1995)).

[8]Texas courts have applied this rule in the context of article 11.072 habeas applications.  *See Ex parte Gonzalez*, 323 S.W.3d 557, 561 (Tex. App.—Waco 2010, pet. ref'd) (holding that an evidentiary hearing on an 11.072 *Herrera* claim is not required if the habeas judge presided over the applicant's trial); *Ex parte Franklin*, 310 S.W.3d 918, 921–23 (Tex. App.—Beaumont 2010, no pet.) (requiring an evidentiary hearing on an 11.072 *Herrera* claim if the habeas judge did not preside over the applicant's trial); *Ex parte Irwin*, No. 02-09-00282-CR, 2009 WL 3720176, at *1 (Tex. App.—Fort Worth Mar. 24, 2010, pet. ref'd) (mem. op.) (not designated for publication) (affirming trial court's denial of an 11.072 actual innocence and an ineffective assistance claim).

[9]As the court of criminal appeals explained in *Ex parte Tuley*:

*Tuley*, 109 S.W.3d 388, 393–96 (Tex. Crim. App. 2002)). "Establishing a bare claim of actual innocence is a Herculean task." *Ex parte Brown*, 205 S.W.3d at 545.

In reviewing a *Herrera* claim, the habeas court must first consider whether the applicant presented newly discovered evidence that affirmatively establishes his innocence. *Ex parte Franklin*, 72 S.W.3d at 678; *see Ex parte Calderon*, 309 S.W.3d 64, 65 (Tex. Crim. App. 2010); *Ex parte Brown*, 205 S.W.3d at 546. If the applicant presents such evidence, the habeas court then determines whether the applicant proved by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence.[10] *Ex parte Brown*, 205 S.W.3d at 544; *Ex parte Franklin*, 72 S.W.3d at 678. The habeas

---

The guilty plea process is not perfect. But guilty pleas allow the parties to avoid the uncertainties of litigation. The decision to plead guilty, as we have seen in this case, may be influenced by factors that have nothing to do with the defendant's guilt. The inability to disprove the State's case, the inability to afford counsel, the inability to afford bail, family obligations, the need to return to work, and other considerations may influence a defendant's choice to plead guilty or go to trial.

109 S.W.3d 388, 393 (Tex. Crim. App. 2002).

[10]"[C]lear and convincing evidence is an intermediate standard of proof which falls between the ordinary civil 'preponderance of the evidence' standard and our usual 'beyond a reasonable doubt' standard in criminal cases." *Ex parte Elizondo*, 947 S.W.2d at 212 (Baird, J., concurring). "Clear and convincing evidence is defined 'as that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)).

5

court must examine the "newly discovered evidence" and determine whether the "new" evidence, when balanced against the "old" inculpatory evidence, unquestionably establishes the applicant's innocence. *Ex parte Thompson*, 153 S.W.3d 416, 417 (Tex. Crim. App. 2005). The habeas court does not review the fact finder's verdict but instead decides whether the newly discovered evidence would have convinced the fact finder of the applicant's innocence. *Ex parte Elizondo*, 947 S.W.2d at 207, 209; *see Ex parte Thompson*, 153 S.W.3d at 427–28 (Cochran, J., concurring). If the applicant entered a guilty plea, the guilty plea—along with any evidence entered, or stipulation to the evidence, supporting the plea—must be considered in weighing the old evidence against the new evidence. *Ex parte Tuley*, 109 S.W.3d at 392 ("A convicting court is not free to ignore a guilty plea when reviewing a collateral attack."). Courts should "give great respect to knowing, voluntary, and intelligent pleas of guilty." *Id.* at 391.

### 2. Standard of Review

While we look to the court of criminal appeals's opinions in article 11.07 habeas cases for some guidance in addressing this issue, we consider that the higher court has noted "at least one significant distinction" between the posture of article 11.07 and article 11.072 habeas cases. *See Ex parte Garcia*, No. PD-1658-10, 2011 WL 4436554, at *2 (Tex. Crim. App. Sept. 14, 2011). In *Garcia*, the court of criminal appeals explained that,

> In article 11.07 habeas cases, this Court is the ultimate finder of fact; the trial court's findings are not automatically binding upon us, although we usually accept them if they are supported by the record.

6

> In an article 11.072 habeas case, however, the trial judge is the sole finder of fact. There is less leeway in an article 11.072 context to disregard the findings of a trial court. Because the court of appeals and this Court are truly appellate courts in the article 11.072 context, it makes sense as a matter of logic that the *Guzman* [*v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)] standard would control.

*Id.* (citations omitted).

Thus, absent an abuse of discretion, we must affirm a habeas court's decision on whether to grant the relief requested in a habeas corpus application. *See Garcia*, 2011 WL 4436554, at *2; *see also Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App.), *cert. denied*, 549 U.S. 1052 (2006); *Ex parte Karlson*, 282 S.W.3d 118, 127 (Tex. App.—Fort Worth 2009, pet. ref'd); *Ex parte Twine*, 111 S.W.3d 664, 665 (Tex. App.—Fort Worth 2003, pet. ref'd). We review the evidence in the light most favorable to the habeas court's ruling. *Kniatt*, 206 S.W.3d at 664. In conducting our review, we afford great deference to the habeas court's findings of fact and conclusions of law that are supported by the record. *Ex parte Karlson*, 282 S.W.3d at 127–28. This deferential review applies even when the findings are based on affidavits rather than live testimony. *Ex parte Wheeler*, 203 S.W.3d 317, 325–26 (Tex. Crim. App. 2006). We also afford great deference to the habeas court's application of the law to the facts, to the extent that the resolution of the ultimate question turns on an evaluation of credibility and demeanor. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d

335, 371 (Tex. Crim. App. 2007). If the resolution of the ultimate question turns on an application of legal standards, we review the determination de novo. *Id*

## B. Applicable Facts

In the early 1990s, the State began investigating the alleged sexual abuse of J.A.L. (a child younger than 17 years of age) and her siblings, J.H.L. (J.H.) and J.E.L. (J.E.), by various individuals, including their parents, Joseph and Wanda L. During the investigation, J.A.L. and J.H. told law enforcement officials that "Jimmy" had sexually abused J.A.L. The State charged the parents, Mello, Donald Tomlin, and Frank Montgomery with varying degrees of sexual offenses. The parents were tried and sentenced to lengthy prison sentences. Tomlin and Montgomery both entered guilty pleas and were sentenced to prison terms, which they have served.

### 1. Mello's Original Plea

In September 1994, Mello pleaded guilty to committing indecency with a child by contact against J.A.L. on or about September 1, 1990.[11] The docket sheet provides that "[a]fter hearing the evidence, the Court found that the evidence substantiate[d] the defendant's guilt" but that the assessment of punishment would be deferred for three years. While the habeas record does not

[11]At the habeas hearing, the habeas court took judicial notice of the original court file in this case as well as the affidavits, documents, and photographs that the parties presented in their habeas pleadings. While the habeas record does not contain a separately designated copy of the original court file, a copy of either the complete file or a large portion of it is attached to Mello's habeas application.

8

specifically delineate the evidence introduced at Mello's 1994 plea hearing, the habeas court, without objection, took judicial notice of and considered the following documents from the investigation of this case (attached to the State's habeas response).

### a. 1993 Investigative Report

One such document was a May 6, 1993 investigative report:

When our office joined in the investigation of the [L.] family in [the] summer [of] 1992[,] we obtained the identities of each Donnie, Eddie, Jimmy, and others, who had worked at the Dairy Queen[] where [J.A.L.'s mother and father] had worked. D[river's] L[icense] photos were obtained and placed in a group of sixteen photos. [An investigator] interviewed [J.H.] and his foster mom. Among those [J.H.] [identified] was defendant James Mello. [J.H.'s] younger sister, victim [J.A.L.], identified the photo of Jimmy Jacobs, who was another Jimmy who had worked with their parents. The photos of Mello, Tomlin, and others were very poor quality. Jacobs denied ever being in the [L.] family home but did work at the Southlake D.Q. where the [L.] children visited often. [Portion of statement redacted here.]

James Mello was also identified as being an accomplice in these crimes by other Defendants (Donald Tomlin & Frank Edward Montgomery). Mello also admitted being in the [L.] home many times. [Portion of statement redacted here.]

The case against Mello was just recently finalized and he was just recently arrested, and a mug shot photo taken is of much better quality than the D.L. photo. This mug shot was taken on 4-29-93, or approximately two and one half years after . . . "Jimmy" violated the children.

On 5-06-93 I took a six photo lineup of mugshots of white males to [J.A.L.'s] foster residence. Mello was one of the six. [J.A.L.] viewed it for about five minutes and was unable to make a positive ID of the Jimmy who abused her, but she did point out two photos stating that he could be one of the two. One of the photos was Mello. On a

9

photo copy of the lineup she circled them and signed it. Foster mom Freeman also signed as a witness.

### b. Frank Montgomery's 1993 Sworn Statement

In his March 1993 sworn statement, Frank Montgomery stated that the State charged him with the sexual assault of J.A.L.; that in 1990 he worked at the Southlake Dairy Queen where Joe L. was the manager; that he rented a room in a shack behind the L.'s house for three or four months; that Wanda and Joe L. had four children, including J.A.L. and J.H.; that he engaged in sexual acts with J.A.L. and J.H.; that while living in the shack, he would look in the windows of the house; and that he witnessed several sexual assaults on the children. Montgomery further stated,

> A young guy who worked [at the Dairy Queen], who I was referring to as Donnie earlier, came to the [L.'s] often. I have looked at photos and I have identified a photo as being the guy that I have been calling Donnie and I wrote on the back of it that I had seen [J.A.L. performing sex acts on him]. I have been told his name is Jimmy. The name Donnie has been mentioned to me ever since I was first arrested but the photo I have been told is Donnie is not who I have been referring to as Donnie. . . . I saw Jimmy fondling [J.A.L.] or touching her private area.

The picture Montgomery identified was a driver's license photograph of Mello. Montgomery also stated that he agreed "to testify against the others involved" and that he expected leniency in his case.[12]

---

[12]In February 1994, Montgomery testified in Joe L.'s trial that he had seen "a guy named Jimmy" who worked at the Dairy Queen at the L. house having sex with J.A.L.

### c. Donald Tomlin's 1993 Sworn Statement and Plea Admonishment

In his February 1993 sworn statement, Donald Tomlin stated that he understood he was "facing criminal charges for involvement with the [L.] kids," that he worked at the Dairy Queen with Joseph L., that he had been to the L. home on several occasions (where he observed the parents sexually abusing the children), and that nine– or ten–year old J.A.L. and seven– or eight–year old J.E. performed oral sex on him three or four times each. Tomlin further stated that "Jimmy Mello is a friend of mine who worked at the Dairy Queen and also went to [the L.] house"; that he and Jimmy talked about "the girls" and that "Jimmy said that he had had oral sex, or a term meaning the same thing with them." Tomlin stated that Jimmy was in the photograph he identified and signed that day.

In May 1993, Tomlin signed written plea admonishments and agreed that he would

> testify truthfully against co-defendants—Joseph Lee [L.], Wanda [L.], Frank Edward Montgomery, James Mello, and any other person charged with sexual offenses committed against the [L.] children of which this def. has knowledge & adopt prior testimony as truthful given in Jan. 1993.

### 2. Newly-Tendered Habeas Evidence

At the January 2010 habeas hearing, the habeas court took judicial notice of the affidavits, documents, and photographs attached to the parties' habeas pleadings.

11

### a. Mello's Documentary Evidence

#### (1) J.A.L.'s June 2009 Affidavit

In her June 3, 2009 affidavit, J.A.L. states that her parents and "several other men" including a man named "Jimmy" committed sexual offenses against her and her siblings. She states that an attorney for Mello, Gary Udashen, "has shown me a picture of James Mello from the mid-1990's" and that "[t]he person in the picture . . . is not the Jimmy that was involved in this and he had nothing to do with the offense against me." J.A.L. recounts that Udashen asked her to "write that down" and that she wrote on the back of the picture the following:

> This is certainly (100%) not the man who should be registered for hurting me. I have never seen him before. Jimmy was a bigger man with darker hair. I remember him very well.

The photograph was attached to the affidavit.

#### (2) Frank Montgomery's May 2009 Affidavit

In his May 4, 2009 affidavit, Frank Montgomery states that he pleaded guilty to indecency with a child in Tarrant County, Texas in 1993 and that he testified against Joe L. in 1994 and implicated "Jimmy." Montgomery indicates that more recently a private investigator named Jay Matthews sent him a picture and asked if he knew the person in the photograph. Montgomery states, "I do not recognize the person in this picture and I do not know this person." He also states that he was not referring to the person in the picture when he testified at Joe L.'s trial. The picture is signed and attached to his affidavit, and it is the same photograph that Udashen showed J.A.L. in 2009.

12

## (3) Donald Tomlin's April 2009 Affidavit

In his April 26, 2009 affidavit, Donald Tomlin states he was convicted in Tarrant County of a sexual offense involving a child of Joseph and Wanda L. He also states,

> I know James Mello and I knew him during the time period that the allegations against me and the [L.'s] and others arose. During the entire time I knew James Mello, he never went by Jimmy. Rather, he was always known as James. If someone during that time period referred to a person named Jimmy they would not be referring to James Mello. . . .
>
> There was a person named Jimmy that worked at the Dairy Queen but I do not remember his last name. The Jimmy who worked at the Dairy Queen was not James Mello.
>
> I do not believe that James Mello ever had any type of sexual contact or activity with any of the [L.] children. I have never told anybody that he did and I never told anybody that I was going to testify that he did.

Mello also tendered a second affidavit from Tomlin which states that he reviewed his 1993 statement and that he did not

> recall saying this about Mr. Mello. If I did, it was because I was willing to say anything to try to stay out of prison and I was told by law enforcement that Mr. Mello was involved and they had him. The statement that Mr. Mello is alleged to have said to me is not accurate.
>
> . . . .
>
> I do not think James Mello did anything to the [L.] children and I do not think he is the type of person who would do something to them.

13

### (4) Friends and Relatives' Affidavits

Mello submitted seven affidavits signed in 2009 stating, in essence, that Mello has always been known as "James," not "Jim" or "Jimmy."[13] Mello also tendered a November 2009 affidavit from Wanda L., in which she states that "Jim (James Mello) was hardly ever at our home in Southlake, Tx. and on the rare occasion that he was there he never had an opportunity to be alone with my children ([J.A.L.])."[14]

### b. State's Habeas Evidence

### (1) Documents Referring to Mello as "Jim" or "Jimmy"

In its habeas response, the State tendered Tomlin's 1993 affidavit in which he referred to "Jimmy Mello" as a friend who worked at the Dairy Queen who also sexually assaulted J.A.L. Additionally, the State submitted Mello's 1990 Dairy Queen employment application in which he listed his name as "Jim O. Mello III." The State also submitted photocopied pages from Mello's 1986 school annual where he was listed as "Jim Mello."

---

[13]For example, Mello's niece, Alexas Hobbs, states that she was raised by "James'[s] mom," grew up with Mello, and "through that time we have always called him James." Although other witnesses made similar statements, they did not provide a specific time frame and did not profess to know Mello at the time of the 1990 offense. For instance, David Nieland states that "[i]n all the years" that he had been a client of Mello's, he had "never heard him go by Jimmy, Jim, or any other names besides James." Matthew Mowles states that he has "never heard anyone refer to James Mello as 'Jimmy'" and that Mello's mother introduces herself as "'James'[s] Mother.'"

[14]Notably, Mello admitted to an investigator in 1993 that he had been in the L. home "many times."

14

### (2) J.A.L.'s July 2009 Affidavit

In a July 15, 2009 affidavit, J.A.L. recounts the circumstances surrounding her June 2009 affidavit. J.A.L. explains that Mello's habeas counsel "told [her] that they believed that James Mello was not the same 'Jimmy' that we knew several years ago"; that Mello never went by the name Jimmy and had never worked at Dairy Queen; and that the wrong person had been sent to jail. Later, habeas counsel came to her house and showed her "a picture of a guy" and "led [her] to believe that the picture [she] was looking at was a photo of '[J]ames' from back then." J.A.L. recounts her statement to habeas counsel that the picture did not look like the Jimmy she remembered. J.A.L. states that "the guy called Jimmy had darker hair and darker skin" than the picture habeas counsel showed her.

### (3) J.H.'s July 2009 Affidavit

In a July 14, 2009 affidavit, J.H. states that he received a 2009 package from a Dallas attorney containing materials from this case, including a picture. J.H. recounts that the attorney subsequently called him on the telephone and asked him if the person in the photograph was James Mello. According to J.H., he told the attorney that he was "about 50 – 50 percent" sure that it was not. Although J.H. initially agreed to sign an affidavit to this effect, he ultimately decided against it. J.H. further explains that, afterward, investigator Kathy Manning with the Tarrant County District Attorney's Office contacted him and

showed him the same picture that had been mailed to him.  J.H. explains that

that picture

> looks like what I remember James Mello to look like by the smile, but I am only 50 percent sure.  Investigator Manning showed me an old picture of a very much younger version of the same person.  By looking at both of the pictures at the same time I am 100 percent sure that they are the same person that I knew to be "Jimmy."

### c.  Live Testimony

At the habeas hearing, Mello called J.A.L., and the State called J.H.

### (1)  J.A.L.'s Testimony

On direct examination, Mello's habeas counsel showed J.A.L. the picture he had presented to her in 2009—an 8 x 10 colored professional-looking headshot of Mello in a blue sweater with a bright blue background (Photo A).[15] J.A.L. testified (consistent with her June 2009 affidavit) that she did not recognize the person in Photo A.  Habeas counsel then showed J.A.L. three additional photographs of Mello, including (1) a color photograph of Mello (similar to a yearbook photo) wearing a "bright blue-and-white patterned shirt"[16] (Photo B); (2) a color snapshot of Mello sitting at a dining room table dated December 1990

---

[15]The parties and the court referred to this photograph as "the big picture with a blue background."  This photo, Photo A, is not dated.

[16]The State advises that this undated photograph was part of its investigation file and that it is reasonable to deduce that the picture was taken before Mello pleaded guilty in 1994.

(Photo C); and (3) a black and white copy of Mello's driver's license picture estimated to have been taken in 1992 (Photo D).[17]

J.A.L. testified that she recognized the person in Photos B and C (and to a lesser extent the person in Photo D) from the time of the offense. She testified that the person depicted in Photos B, C, and D looked different to her than the person depicted in Photo A. When asked if the person she recognized in Photos B, C, and D was "one of the people who did something" to her, J.A.L. responded, "I don't remember." She explained, however, that she remembered him "being at [her] house." When asked if she remembered the people who "did these things to her," she stated that she did not "recall the situations." She agreed with habeas counsel that she did not "remember the specifics of it."

On cross-examination, J.A.L. testified that the person in Photo A looked "a lot more, I guess, Irish, you would say, has red hair, has a more paler, a red tint to his skin." She further explained that the person in Photo C "has more of a like tan skin with dark curly hair" and that, in comparing it with Photo A, "[t]hey just look like different people to me." She reiterated that the person in Photo C was "definitely" more like what she remembered "Jimmy" looking like at that time.

**(2) J.H.'s Testimony**

J.H. testified for the State that he recognized the person in the photograph mailed to him in 2009 as "the guy we called Jimmy." J.H. also identified Mello in

---

[17]Although the exact date of the driver's license picture is not provided, it was shown to J.H. and Montgomery at the time of the original investigation.

open court.  When asked how he recognized Mello, J.H. stated, "I—just the smile—not the smile.  The cheeks, the lips, you know.  Just his mouth area, really."  When asked how he knew Jimmy, J.H. stated that Jimmy had been at his house and thrown him off the balcony when he (J.H.) had been around nine years old.  He further explained that Jimmy, Donnie, and Eddie would come to their Southlake house about once a week "to party" and that no one else named Jimmy came to the house.  J.H. stated that he did not always see the three men because they would not always come upstairs, where he was locked up in his room.  He also stated that he never saw Jimmy sexually assault J.A.L.

## C.  The Habeas Court's Findings, Conclusions, and Judgment

On May 10, 2010, the habeas court made findings of fact and conclusions of law and denied Mello's habeas application.  In addition to summarizing J.A.L.'s statements and finding her testimony credible, the habeas court found that J.A.L.'s "inability to recognize Applicant from the blue background photograph [Photo A] [was] not affirmative evidence of innocence" due to "the amount of time that has lapsed; the visual differences in coloring, tint, and build of Applicant between the blue background photograph [Photo A] and the dining room table photograph [Photo C]; and the confirmation that the dining room table photograph was taken near the time of the offense."  In addition to making several additional findings, the habeas court

●  found that Frank Montgomery's 1993 affidavit was "more accurate" than his 2009 affidavit (which the court found to be "not credible") due to the amount

18

of time that had elapsed and the visual differences between Photo A and Photo C;

● listed—but did not make a credibility finding regarding—Donald Tomlin's sworn statements and signed written plea agreement;

● found J.H.'s testimony to be credible; and

● found "that there is evidence that Applicant was the person referred to as 'Jimmy' by both the children and co-defendants in this case."

The habeas court concluded that Mello (1) failed to present affirmative evidence that he is innocent; (2) failed to present newly discovered evidence that is affirmative evidence of innocence; (3) failed to prove by clear and convincing evidence that no reasonable juror would have convicted him in light of J.A.L.'s affidavit; and (4) failed to prove that he is actually innocent.

## D. Mello's Challenges on Appeal

On appeal, Mello challenges the habeas court's conclusions (and underlying findings) that J.A.L.'s testimony and Montgomery's 2009 affidavit did not affirmatively establish his innocence. Mello also challenges the habeas court's finding that there is evidence that Mello was the person referred to by J.A.L., J.H., and Mello's co-defendants as "Jimmy."

Mello challenges the habeas court's conclusion as to J.A.L. because (1) J.A.L. "looked at a picture of Mello [Photo A ] and said that she is 100% sure that he is not the person who did these things to her," and (2) she "has never said that Mello is the person who committed the offense and her statement that he is not has not been contradicted." Mello omits several significant facts. Although

Mello bears the burden of persuasion, Photo A is not dated. The indictment asserts that the offense occurred on or about September 1, 1990. The only evidence Mello presented as to when Photo A was taken is J.A.L.'s statement in her June 2009 affidavit that "Mr. Udashen has shown me a picture of James Mello from the mid-1990's." There is no corroborating evidence that this time frame is accurate. Thus, Mello presented no affirmative evidence that Photo A was taken at or near the time of the offense, or more importantly, that Photo A reflects Mello's appearance at the time of the offense. In fact, J.A.L.'s testimony supports the habeas court's finding that J.A.L.'s "inability to recognize [Mello] from the [Photo A] is not affirmative evidence of innocence." J.A.L. recognized the "'Jimmy' who went to her house" in Photos B and C, and the State established that these photographs were taken before Mello pleaded guilty. J.A.L. "definitely" recognized "Jimmy" in Photo C—in which he is shown sitting at a dining room table in December 1990—as how he looked around the time of the offense. J.A.L. specifically testified that the person depicted in Photos B, C, and D looked different to her than the person depicted in Photo A.

Also, J.A.L.'s testimony that she did not recall whether the "Jimmy" in Photos B and C "did something" to her is not a recantation. J.A.L. was eight years old at the time of the 1990 offenses, and she was unable in 1994 to affirmatively identify Mello as one of the men who sexually abused her. At the habeas hearing sixteen years later, J.A.L. testified to "Jimmy" being at their house "back during that time period." Based on the trauma J.A.L. underwent, it is

20

understandable that she would not remember "the specifics of it." Thus, the record supports the habeas court's finding that J.A.L.'s inability to recognize Mello in Photo A is not affirmative evidence of innocence. The record also supports the habeas court's conclusion that J.A.L.'s June 2009 affidavit and her 2010 testimony are not affirmative evidence of Mello's innocence.

Further, the record supports the habeas court's findings that Montgomery's 2009 affidavit is not credible and that his 1993 affidavit is more accurate; it also supports the habeas court's conclusion that Montgomery's 2009 affidavit is not affirmative evidence of Mello's innocence. As previously discussed, Mello failed to establish that Photo A reflects Mello's appearance at the time of the offense.

Regarding Tomlin's recent affidavits, Mello notes without argument that the trial court "simply summarized" Tomlin's several statements "without drawing any real conclusions." Although the trial court did not make explicit conclusions as to Tomlin's 1993, 2009, and 2010 statements, the habeas judge stated at the hearing that he was "quite skeptical of the weight" he might give to Tomlin's statements and that he was not sure that the statements were "going to count for much."[18] Notably, Mello himself advocated the following finding in his proposed

---

[18]At the beginning of the habeas hearing, the habeas court noted as to Tomlin's statements,

> [W]hen there are affidavits and four documents all which totally conflict, I'm not sure what weight any sound factfinder would give to conflicting documents in sorting out what's the truth in a vacuum, but I don't know what other evidence will be presented in

21

findings of fact and conclusions of law: "The statements from Tomlin are contradictory and inconsistent. The Court finds that the statements from Tomlin are entitled to no weight and will form no part of the Court's decision in this case." It appears that the habeas court adopted this finding without explicitly stating so. We conclude that the habeas court's findings and conclusions adequately resolve Mello's actual innocence claim and that the record supports the habeas court's conclusion that Mello failed to present newly discovered evidence that is affirmative evidence of innocence.

When an applicant asserts a *Herrera*-type claim based on newly discovered evidence, the evidence presented must constitute affirmative evidence of the applicant's innocence. *Ex parte Franklin*, 72 S.W.3d at 678. "Once the applicant provides such evidence, it is then appropriate to proceed with a determination of whether the applicant can prove by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence." *Id.* Thus, in this case, the habeas court's analysis was

---

this hearing, and it may or may not have the same impact, favorably or unfavorably, if he took the stand and testified.

. . . I will state I'm quite skeptical of the weight that might be given to them in light of the fact that there are multiples. There's a written statement that purports to be notarized, although there's no seal, and two affidavits, and including a statement of memory failure, and so I'm just not sure they're going to count for much. But I will admit them in light of all the evidence and not make that decision until I've heard all the evidence and then decide what, if anything, that they add to or detract from either side's position.

complete when it concluded that Mello failed to provide affirmative evidence of his innocence. *Id.*; *see Ex parte Thompson*, 153 S.W.3d at 427 (Cochran, J., concurring) (explaining that "[o]nly if the trial court finds that the new evidence is both credible and, by clear and convincing evidence, that evidence, by itself unquestionably establishes the applicant's innocence, should the trial court continue" by evaluating the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole and in light of the previous proceeding). Although the habeas court concluded that Mello failed to affirmatively prove his innocence, it continued its analysis and further concluded that Mello "failed to prove by clear and convincing evidence that no reasonable juror would have convicted him in light of [J.A.L.'s] affidavit." Mello's remaining challenges focus on this conclusion.

For instance, Mello takes issue with the habeas court's finding that "there is evidence that [Mello] was the person who is referred to a[s] 'Jimmy' by both the children and co-defendants in this case." Specifically, Mello challenges the habeas court's finding that Montgomery saw Mello sexually assault J.A.L., asserting that the habeas court did not address "the fact that Montgomery was confused as to whether he saw Donnie or Jimmy commit the offense." Mello also maintains that the habeas court failed to consider that J.H. did not see who sexually abused J.A.L. so "his testimony is not evidence of Mello's guilt." In

23

addition to Mello's factual assertions not being supported by the record,[19] the habeas court does not review the fact finder's verdict but instead decides whether the newly discovered evidence would have convinced the fact finder of the applicant's innocence. *See Ex parte Elizondo*, 947 S.W.2d at 207, 209. The habeas court must assess whether the "new" evidence satisfactorily rebuts or nullifies all of the State's primary inculpatory evidence from the "old" trial. *Ex parte Thompson*, 153 S.W.3d at 428.

As previously discussed, the record supports the habeas court's conclusion that Mello failed to present affirmative evidence of his innocence. Additionally, the record supports the habeas court's finding that there was evidence that Mello was "Jimmy." In addition to the evidence set out above, Mello pleaded guilty to committing indecency with a child by contact.[20] *See Ex*

---

[19]First, the habeas court stated in its findings that J.H. "did not see [Mello] sexual[ly] assault [J.A.L.]"; yet, the court also noted and found credible J.H.'s testimony that he recognized Mello from when he would come to their house during the time of the sexual assaults, that Mello "would hang out at their house with Eddie and Donnie," and that "there was no one else named Jimmy who would come over to their house." Also, contrary to Mello's contention that Montgomery's 1993 affidavit demonstrates that he was confused as to whether he saw Donnie or Jimmy commit the offense, Montgomery's 1993 affidavit states that he saw an individual engage in sexual acts with J.A.L. and that he thought the individual's name was "Donnie" but that, when he identified the offending individual in a photograph, officials told him the individual's name was "Jimmy." Indeed, the photograph Montgomery signed was Mello's driver's license photo, and after being shown a photo of "Donnie," Montgomery verified that the individual he had seen engage in sexual acts with J.A.L. was "Jimmy" not "Donnie."

[20]Mello has not been convicted of the offense to which he pleaded guilty, and we do not comment on evidentiary sufficiency challenges in deferred

*parte Tuley*, 109 S.W.3d at 392 ("A convicting court is not free to ignore a guilty plea when reviewing a collateral attack."), 393 ("Convictions based on knowing, intelligent, and voluntary pleas of guilty ought to be afforded the highest level of respect."). Mello did not present evidence to the habeas court that his guilty plea was inaccurate, involuntary, or unknowing.[21] *Cf. id.*, 109 S.W.3d at 395 (granting relief in an article 11.07 actual innocence case in which the complainant recanted, Tuley produced evidence in support of his several reasons for pleading guilty, and the habeas court found Tuley's explanations credible); *see also Ex parte Brown*, 205 S.W.3d at 548 (denying relief in an article 11.07 actual innocence case and noting that Brown's explanation for pleading guilty, even though he was not guilty, was not "entirely implausible" but "hardly persuasive").

Mello cites *Ex parte Thompson*, *Ex parte Tuley*, and *Ex parte Elizondo* in support of his arguments. *See Ex parte Thompson*, 153 S.W.3d at 416;[22] *Ex*

---

adjudication cases. *See Donovan v. State*, 68 S.W.3d 633, 636 (Tex. Crim. App. 2002) (contrasting deferred adjudication and regular community supervision).

[21]Mello stated in his habeas application (and echoes in his appellate brief) that "he was told by his trial attorney that the State had witnesses who would be testifying against him and, despite his consistent protestations of innocence, he reluctantly agreed to accept the 3 years deferred adjudication offer from the state." Notably, however, Mello neither tendered his own affidavit nor testified at the habeas hearing; therefore, his bare allegations do not constitute evidence before the habeas court.

[22]A jury convicted Thompson of sexually assaulting his five-year-old daughter based primarily on her testimony (when she was eight years old), her mother's testimony, and a torn dress (allegedly torn by Thompson during an assault). *Id.*, 153 S.W.3d at 418. Thompson testified at the punishment phase that he was "truly sorry about this happening" and that he would "never let it

*parte Tuley*, 109 S.W.3d at 388;[23] and *Ex parte Elizondo*, 947 S.W.2d at 202.[24]

These cases are distinguishable both procedurally and factually. In each case,

___

happen again." *Id.* At a habeas hearing twenty years later, various witnesses described the ongoing custody dispute between Thompson and his ex-wife at the time of the allegations. *Id.* at 419. The complainant explained that the abuse had never happened, that she was afraid of her mother, and that her mother had pressured her into accusing her father of sexual abuse. *Id.* The mother denied these allegations but admitted to having doubts about whether Thompson had sexually assaulted her daughter. *Id.* A bus driver testified that, around the time of the allegations, he witnessed the complainant fall on the bus and tear her dress. *Id.* A social worker testified that the complainant's recantation was "valid." *Id.* at 420. Thompson testified that his attorney had advised him to say he was sorry for what he had done so he would receive a more lenient sentence. The habeas court recommended that relief be granted, and the court of criminal appeals agreed. *Id.*

[23]In *Tuley*, the child-complainant testified at trial that Tuley, her mother's live-in boyfriend, had sexually molested her. *Id.* at 411. Her mother testified that around that same time, Tuley had stopped having sex with her and the child's behavior had changed drastically for the worse. *Id.* The mother kicked Tuley out of the house and called the police. *Id.* at 412–13. Almost immediately after telling her mother of this abuse, the child admitted to friends that she had fabricated her story to get Tuley out of her home, but these friends did not testify to this at trial. *Id.* at 396. Tuley's jury deadlocked on the question of guilt, which led to Tuley pleading guilty to an aggravated sexual assault charge. *Id.* at 389–90. Two years later, the child recanted, explaining she "hated" Tuley and had wanted him out of the house. *Id.* at 396. Tuley explained that he pleaded guilty because he was unable to make bail, and keep retained counsel, and he had already spent ten months in jail awaiting his first trial and would have had to continue his incarceration during a second trial. *Id.* at 395. He was addicted to drugs at the time. *Id.* The convicting court recommended granting relief, finding that "the evidence of [Tuley's] guilt is so far outweighed by the evidence of [his] innocence as to be entirely one-sided." *Id.* at 397. The court of criminal appeals agreed. *Id.*

[24]Elizondo was convicted of aggravated sexual assault based primarily on the testimony of his stepson Robert. *Id.*, 947 S.W.2d at 209. Thirteen years later, Robert recanted, stating that his natural father "relentlessly manipulated and threatened [him] into making such allegations against [the defendant] in order to retaliate against [his] natural mother, [the natural father's] ex-wife, for

26

the habeas court found that the applicant had met his burden of proving actual innocence with newly discovered evidence, and the court of criminal appeals, acting on the habeas court's recommendation in each case, granted relief. In this case, Mello asks us to overturn the habeas court's ruling. As previously noted, our review of an article 11.072 habeas claim is more limited than that of the court of criminal appeals's review of an article 11.07 habeas claim.

In reviewing the record before us, we find nothing contrary to the habeas court's findings of fact. Further, based on our review of the law and the record before us, we cannot say that the habeas court abused its discretion by denying Mello habeas corpus relief. We therefore overrule Mello's sole point.

## IV. Conclusion

Having overruled Mello's sole point, we affirm the trial court's judgment denying habeas relief.

ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

PUBLISH

DELIVERED: October 27, 2011

---

marrying [the defendant] years before." *Id*. at 210. The habeas court concluded that Robert had testified falsely at trial and recommended granting relief. The court of criminal appeals granted relief, stating that "another jury hearing the evidence, including the newly discovered mature recantation of Robert's juvenile testimony, would view the new evidence as the more credible and would acquit applicant." *Id*.

27