

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00198-CR

EX PARTE MITCHELL WAYNE
WATTS

----------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. C-372-010536-1262636-AP

----------

## MEMORANDUM OPINION[1]

----------

Appellant Mitchell Wayne Watts appeals from the trial court's denial of his article 11.072 application for writ of habeas corpus. Tex. Code Crim. Proc. Ann. art. 11.072 (West 2015). We conclude the trial court did not abuse its discretion by denying Watts's application and, therefore, we affirm.

---
[1]*See* Tex. R. App. P. 47.4.

# I. BACKGROUND

In 2011, Erica[2] made an outcry that Watts had sexually molested her in July 2006, when she would have been nine or ten years old. Erica stated that Watts had masturbated in front of her; had gotten into the shower with her; had penetrated her sexual organ with his fingers; and had held her down. Watts was subsequently charged with one count of aggravated sexual assault of a child, one count of indecency with a child by contact, and one count of indecency with a child by exposure. *See* Tex. Penal Code Ann. § 21.11(a)(1), (a)(2)(A) (West 2011), § 22.021(a)(1)(B)(i), (a)(2)(B) (West Supp. 2016). On August 13, 2012, pursuant to a plea-bargain agreement, Watts pleaded guilty to the indecency-by-exposure count, the State waived the other two counts, and the trial court placed Watts on deferred-adjudication community supervision for ten years.

On August 4, 2015, Watts filed this habeas application alleging, as his sole ground for relief, that new evidence established his actual innocence. The new evidence, Watts alleged, was Erica's recantation of the allegations she made against him in 2011. Watts attached to his application an affidavit Erica executed, in which she averred, "I fully retract my statement against [Watts] in 2011 accusing him of molesting me. It is not true and did not happen ever. [Watts], in no way, shape[,] or form, ever molested me." The trial court held a

---

[2]We use aliases to refer to individuals who were minors at the time the charged offenses were committed. *See* Tex. R. App. P. 9.10(a) (providing privacy protection for sensitive data in criminal cases, including the name of a minor).

hearing, and after concluding that Erica's recantation was not credible, it denied Watts's application.

## II. WATTS'S ACTUAL-INNOCENCE CLAIM

In his sole issue, Watts argues that because Erica's recantation is newly discovered evidence that affirmatively establishes his innocence and no reasonable juror would have convicted him in light of Erica's recantation, the trial court abused its discretion by denying his habeas application.

### A. STANDARD OF REVIEW

In reviewing a trial court's ruling on a habeas application, we view the evidence in the light most favorable to the trial court's ruling and will uphold the trial court's ruling absent an abuse of discretion. *See Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006)*.* In a habeas corpus proceeding under article 11.072, as this one is, the trial court is the sole finder of fact, and the applicable standard of review is the highly deferential standard set forth in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). *State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013). Under that standard, we afford almost total deference to the trial court's factual findings when supported by the record, especially when those findings are based upon credibility and demeanor. *Id.* We also afford great deference to the trial court's application of the law to the facts, to the extent that the resolution of the ultimate question turns on an evaluation of credibility and demeanor. *Ex parte Mello*, 355 S.W.3d 827, 832 (Tex. App.—Fort Worth 2011, pet. ref'd) (op. on reh'g).

## B. THE LAW REGARDING *HERRERA*-TYPE ACTUAL INNOCENCE CLAIMS

Watts has raised a *Herrera*-type actual innocence claim—that is, he has asserted a bare claim of innocence based solely upon newly discovered evidence. *See Herrera v. Collins*, 506 U.S. 390, 396 (1993); *Ex parte Brown*, 205 S.W.3d 538, 544 (Tex. Crim. App. 2006). Such a claim is cognizable in a post-conviction habeas corpus application. *Brown*, 205 S.W.3d at 544. But as the court of criminal appeals has said, "[e]stablishing a bare claim of actual innocence is a Herculean task." *Id.* at 545. Indeed, to prevail on a *Herrera* claim the applicant must show by clear and convincing evidence that no reasonable juror would have found him guilty in light of the new evidence. *Ex parte Navarijo*, 433 S.W.3d 558, 566–67 (Tex. Crim. App. 2014); *Ex parte Vasquez*, 499 S.W.3d 602, 607 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

In reviewing a *Herrera* claim, the trial court must first consider whether the applicant presented newly discovered evidence that affirmatively establishes his innocence. *Ex parte Mello*, 355 S.W.3d at 831. If the applicant presents such evidence, the trial court then determines whether the applicant proved by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence. *Id.* The trial court must examine the "newly discovered evidence" and determine whether the "new" evidence, when balanced against the "old" inculpatory evidence, unquestionably establishes the applicant's innocence. *Id.* The trial court does not review the fact finder's verdict but instead decides whether the newly discovered evidence would have

4

convinced the fact finder of the applicant's innocence. *Id.* If the applicant entered a guilty plea, the guilty plea—along with any evidence entered, or stipulation to the evidence, supporting the plea—must be considered in weighing the old evidence against the new evidence. *Id.*

## C. ANALYSIS

The evidence that Watts contends constitutes newly discovered evidence affirmatively establishing his innocence is Erica's recantation, in both her affidavit and hearing testimony, of the allegations she had made against him in 2011. As noted above, the trial court held a hearing on Watts's application. To help frame our discussion of the testimony at that hearing, we begin by noting two things. First, the record reflects that at the time of Erica's outcry in July 2011, as well as at the time of the habeas hearing on March 4, 2016, Watts lived with Erica's mother. And second, one of the conditions of Watts's community supervision was that he not contact Erica in any manner. With those facts in mind, we turn to the hearing testimony.

### 1. The Habeas Hearing

Echoing her recantation affidavit, at the hearing Erica testified that the allegations she had made against Watts in 2011 were not true. When asked why she had made the allegations if they were not true, Erica replied, "That I don't necessarily have an explanation for. At the time I did not want to live with my mother, and I knew [Watts] had [previously] been accused of [sexual misconduct with a child]." She stated that before her 2011 outcry against Watts, a custody

5

proceeding had been underway between her mother and biological father. With respect to that custody proceeding, Erica indicated that she wanted to live with her father and not her mother. Thus, she testified, her allegations against Watts were an attempt to get out of her mother's house and to go live with her father. In short, Erica testified she made the 2011 allegations against Watts, who was living with her mother, not because the allegations were true, but because she wanted to live with her father rather than her mother.

After Watts's plea of guilty in the resulting criminal case, Erica testified that she did live with her father. In July 2014, she began dating Allen, but her father did not get along with Allen very well. Erica stated that at some point in July 2014, she and her father got into an argument, and she moved out of her father's residence and went to live with her grandmother. Then, in August 2014, Erica's mother drove Erica to the district attorney's office so she could find out what she could do to have Watts's no-contact condition removed. Erica and her mother met with then assistant district attorney Sheila Wynn and Lester Couch, an investigator with the district attorney's office. At one point during the meeting, Erica's mother was asked to step outside of the room, and after she did so, Wynn, with Couch observing, interviewed Erica.

Wynn asked Erica three separate times whether she wanted to recant her 2011 allegations against Watts or whether she just wanted to have his conditions of community supervision changed. All three times, Erica replied that she did not want to recant; she just wanted to make changes to Watts's conditions. Erica

6

said she felt that she was the one being punished by the conditions of Watts's community supervision; that the conditions were against her; and that because of the conditions, she could not visit her mother as much as she wanted. Erica told Wynn that she wanted to make her family whole again and wanted everyone to be together. When the meeting concluded, Wynn told Erica that Watts's conditions could not be removed. And it was only after this August 2014 meeting, in which she learned that Watts's conditions of community supervision would not be removed as she had wanted, that Erica, in September 2014, first recanted her 2011 allegations against Watts in a letter.

In July 2015, Erica, who at that time was pregnant with her first child, had been working at a day care since late February or early March of that year. By July, however, the pregnancy had become hard on her, so she stopped working. Erica testified that her mother had helped her financially during her first pregnancy, and she also testified that her mother had helped her in 2014 by giving her money and by "feeding [her] and helping [her] get clothes and stuff." Erica's first child was born in September 2015. She executed the recantation affidavit Watts attached to his habeas application in August 2015.

By the time of the habeas hearing on March 4, 2016, Erica had become engaged to Allen and was pregnant with her second child. She acknowledged she was experiencing financial difficulties. Indeed, she was receiving governmental assistance through the Supplemental Nutrition Assistance Program (SNAP) and the Women, Infants and Children Food and Nutrition

Service (WIC) and had recently faced eviction for failure to pay rent. She testified that if the conditions on Watts's community supervision did not exist, then her mother would be able to help her by babysitting her infant child and soon-arriving baby. She also stated that without those conditions, she would be able to spend more time with her family. Indeed, she stated that if Watts's conditions did not exist, then she and her children would be able to live with her mother.

Heidi McCusker, Watts's Tarrant County Community Supervision and Corrections Department supervisor, also testified at the hearing. She stated that at her initial meeting with Watts in August 2012, he asked her a question that caused her concern. That question was, "What will happen if [Erica] recants her story?" The reason that caused her concern, McCusker explained, was that just before he asked that question, Watts had told her that he had been charged and convicted "of another case" and had gone to prison, that he had appealed, that he was retried for the offense, and that the charges ultimately were dropped after the victim recanted. This concerned McCusker because she thought Watts may try to enlist Erica's mother to get Erica to recant her allegations.

The State subpoenaed Erica's brother to the hearing and called him as a witness. Erica's brother clearly expressed that he did not want to testify and that both his mother and Erica had come to his place of work to "in a sense" pressure him about his testimony. Erica's brother testified that in 2006, while he and his sister were living with their mother and Watts, he walked into his sister's room

8

unexpectedly and observed his sister and Watts "playing." He further testified that his sister was dressed only in a sports bra and underwear and that Watts admonished him for not knocking before he entered the room, which scared him.

Following the hearing, the trial court made extensive findings of fact and conclusions of law in support of its order denying Watts's habeas application, including the following findings concerning the credibility of Erica's recantation:

70. Hon. Charles Reynolds presided over [Erica's] testimony and found her recantation not credible in light of all the evidence.

71. [Erica's] testimony that [Watts] did not sexually assault her is not credible.

72. [Erica's] recantation is not credible affirmative evidence of innocence.

73. [Watts] has not shown, by clear and convincing evidence, that no reasonable juror would have convicted him in light of [Erica's] testimony or affidavit.

### 2. The Trial Court's Findings Are Supported By the Record

In his brief, Watts acknowledges the fact that in the context of an article 11.072 habeas proceeding, almost total deference is owed to the findings of the trial court that are based upon credibility and demeanor, as the above findings are. *See Guerrero*, 400 S.W.3d at 583. Nevertheless, he asks us to reweigh the evidence and substitute the trial court's findings that Erica's recantation was not credible and did not constitute affirmative evidence of his innocence with contrary findings. He relies on two decisions from the court of criminal appeals to demonstrate that contrary to the trial court's finding, Erica's recantation is

9

affirmative evidence that established his innocence. *See Ex parte Tuley*, 109 S.W.3d 388, 395–97 (Tex. Crim. App. 2002); *Ex parte Elizondo*, 947 S.W.2d 202, 209–10 (Tex. Crim. App. 1996). Both cases are, however, inapposite.

*Elizondo* was a habeas proceeding in which the applicant had been convicted of aggravated sexual assault of a child, *see Elizondo*, 947 S.W.2d at 204, 209–10, and *Tuley* was a habeas proceeding in which the applicant had pleaded guilty to aggravated sexual assault of a child, *see Tuley*, 109 S.W.3d at 390, 395–97. The applicants in both cases raised *Herrera*-type claims of actual innocence based upon the recantations by the complainants of the sexual assault allegations they had made against the applicants. *See Tuley*, 109 S.W.3d at 395–97; *Elizondo*, 947 S.W.2d at 209–10. In both cases, the court of criminal appeals concluded the complainants' recantations were more credible than the testimony at trial and granted relief to both applicants. *Tuley*, 109 S.W.3d at 397; *Elizondo*, 947 S.W.2d at 210.

Watts asserts his case is analogous to *Elizondo* and *Tuley* because like the complainants' recantations in those cases, Erica's recantation explained why she had made false accusations against him. *See Tuley*, 109 S.W.3d at 396; *Elizondo*, 947 S.W.2d at 210. And, Watts argues, like the applicant in *Tuley,* he "comprehensively articulated his reasons for pleading guilty to an offense which he didn't commit." *See Tuley*, 109 S.W.3d at 395. However, unlike here, the respective trial courts in *Tuley* and *Elizondo* found the recantations were credible, and the court of criminal appeals determined the record supported a finding that

10

the recantations were more credible than the trial testimony and constituted affirmative evidence of the applicants' innocence. *See Tuley*, 109 S.W.3d at 397; *Elizondo*, 947 S.W.2d at 210. By contrast, the trial court here found that Erica's recantation was not credible and did not constitute affirmative evidence of Watts's innocence. Our discussion above regarding the circumstances surrounding Erica's recantation demonstrates those findings are supported by the record. And having found that Watts's newly discovered evidence did not affirmatively establish his innocence, the trial court did not abuse its discretion by denying his writ application. *See Mello*, 355 S.W.3d at 839 (citing *Ex parte Franklin*, 72 S.W.3d 671, 678 (Tex. Crim. App. 2002); *Ex parte Thompson*, 153 S.W.3d 416, 427 (Tex. Crim. App. 2005) (Cochran, J., concurring)) (reasoning that the trial court's analysis was complete when it concluded the applicant failed to provide affirmative evidence of his innocence). We overrule Watts's sole issue.

### III. CONCLUSION

Having overruled Watts's sole issue, we affirm the trial court's order denying his article 11.072 application for writ of habeas corpus. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  GABRIEL, KERR, and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 2, 2017