

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00039-CR
_____

E<small>X</small> <small>PARTE</small> J<small>ASON</small> L<small>EE</small> V<small>AN</small> D<small>YKE</small>

On Appeal from County Criminal Court No. 5
Denton County, Texas
Trial Court No. CR-2018-07544-E-WHC-1

Before Kerr, Gabriel, and Bassel, JJ.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

One night, Jason Lee Van Dyke reported that some firearms had just been stolen from his truck, but based on inconsistencies in what he told the responding officers, Van Dyke was arrested for making a false police report. Before he later pleaded no contest, Van Dyke knew that detectives had recovered one of his guns and had charged another person, Corey Momot, with theft of that firearm; Van Dyke nonetheless chose not to fight the false-report charge. Several months later, prosecutors and Momot worked out a deal for Momot to plead down to misdemeanor burglary of a vehicle. This deal was driven by the State's reluctance to try Momot for theft of a firearm with Van Dyke as the complainant, given the latter's no-contest plea to having made a false burglary report and his concomitant susceptibility to being impeached. After Momot entered his plea to burglary of a vehicle, Van Dyke filed an Article 11.072 application for writ of habeas corpus. *See* Tex. Code Crim. Proc. Ann. art. 11.072.

The trial court denied the habeas application, and in five points, Van Dyke appeals that denial. Because Van Dyke has failed to establish that the trial court abused its discretion by denying relief, we affirm.

# I. Background

**A. Van Dyke reports a burglary and is arrested for making a false report to a police officer.**

At 10:41 p.m. on September 13, 2018, City of Oak Point Department of Public Safety officers Shannon Roach and Robert Null responded to a burglary-in-progress call from Van Dyke at his residence. When they arrived, Van Dyke reported that he had been watching television in his bedroom when his car alarm sounded, his dogs started barking, and he heard the horn on his truck beeping. From his office window, Van Dyke saw someone in his truck. Van Dyke then went outside with his shotgun, aimed it at the person, and told the person to freeze. The person ran to a dark-colored car parked in front of Van Dyke's driveway and got into the car on the passenger side. The car took off.

Van Dyke reported that he could not discern the person's race but saw that the person was wearing red shorts and a dark-colored hoodie or jacket with the hood over his head. But Officer Roach observed that a streetlight provided ample lighting in front of Van Dyke's home.

Van Dyke's truck alarm was not sounding when the officers arrived, and Van Dyke told Officer Roach that he was sure that his truck was locked. Although three of the truck's doors were locked, the driver-side rear door was unlocked, and its window was down about four inches.

Officer Roach also saw that the truck's front and rear driver-side windows were damaged and that there were pieces of brick on the ground beside the truck. Van Dyke denied that the damage was there before. Officer Roach noticed that the brick pieces had ash on them and later located a fire pit in Van Dyke's backyard made of the same brick, but some of the bricks were missing. Van Dyke denied that the brick around his truck was from his yard.

Van Dyke reported that the following items were stolen from his truck: (1) a camouflaged Beretta A400 12-gauge shotgun; (2) a camouflaged backpack containing multiple items, including a Glock 29 10mm handgun; (3) a Sig Sauer P320 9mm handgun that had been inside the truck's center console; and (4) a black bag containing camera equipment belonging to Van Dyke's roommate, Isaac Marquardt. Van Dyke stated that "his guess was that the subjects saw his backpack and that when he came outside they decided to grab the shotgun."

Van Dyke told Officer Roach that he had sent a text message to Marquardt about the theft. Van Dyke provided Officer Roach with Marquardt's contact information, and Officer Roach called Marquardt. Marquardt told Officer Roach that around 6:00 p.m. that day, Van Dyke said that he could not find his Glock. Van Dyke and Marquardt searched their house and Van Dyke's truck for the gun but did not find it. While they were looking for the Glock, Van Dyke told Marquardt that his P320 was missing. During their search of Van Dyke's truck, Marquardt realized that

4

the bag containing his camera equipment was also missing. Marquardt said that he and Van Dyke never found the missing items.

According to Marquardt, he and Van Dyke then went to dinner. Afterward, Marquardt went to a friend's house. Marquardt stated that he had not heard from Van Dyke since then. Officer Roach later met with Marquardt, checked his phone, and did not find the text message that Van Dyke claimed to have sent Marquardt telling him about the theft. Office Roach also confirmed with Marquardt that he and Van Dyke did not find the guns they had been looking for on the day of the theft.

After speaking with Marquardt, Office Roach questioned Van Dyke again about the incident. Van Dyke did not volunteer that he and Marquardt had looked for the missing items earlier that evening. Van Dyke maintained that the items were stolen, adding that the burglar ran from Van Dyke's vehicle with a bag in one hand and the Beretta shotgun slung over his body. Van Dyke told Officer Roach that Marquardt's bag had been in the truck, that Van Dyke had placed the Beretta shotgun in the truck that evening, that the Glock in the camouflage backpack had been in the truck for several days, and that he had not seen the P320 in weeks because it was stored in the center console and he had no reason to look for it.

When Officer Roach confronted Van Dyke with Marquardt's statements about searching for the missing guns earlier that evening, Van Dyke stated that they had looked for them earlier that day and had found them. Officer Roach then arrested Van Dyke for making a false report to a police officer.

5

Officer Roach later obtained surveillance video footage from one of Van Dyke's neighbors a few doors down. The camera was directed toward the intersection in front of Van Dyke's home. Officer Roach viewed the video footage from the time Van Dyke claimed his vehicle was burglarized. The video showed two vehicles pulling into other residences and a reflection of Van Dyke's truck's lights flashing but showed no other vehicles or people in the area. Specifically, the video did not show a person getting out of a dark-colored car, a person running back to the car with a bag and a shotgun, or a vehicle fleeing the scene as Van Dyke had claimed.

## B. Van Dyke reports the guns as stolen.

Five days after the alleged burglary, Van Dyke wrote to the Denton County Sheriff to report that the three firearms were stolen on September 13, 2018. Contrary to his statements to Officer Roach that he and Marquardt had searched for and found the guns before the reported burglary, Van Dyke claimed that he had not "laid eyes on or handled" the P320 since he put it in his truck's center console shortly after he purchased the gun on August 25, 2018. He further stated that he had not "laid eyes on or handled the Glock 29" since about September 2, 2018.

## C. Van Dyke's P320 is recovered, and Van Dyke is charged with making a false report to a peace officer.

On September 28, 2018, Momot was arrested on unrelated charges, and Denton Police Department Detective David Bearden questioned him about a drive-by shooting. During the questioning, Momot stated that on September 19, 2018, he had

6

purchased what he believed to be a stolen gun from a friend of a friend named "David" for about $175. Momot told Detective Bearden that the firearm was at his house. When the Denton Police Department executed a search warrant on Momot's home, they recovered Van Dyke's P320.

Detective Bearden contacted Van Dyke about the recovery of his P320 on November 9 and again on November 13, 2018. During their November 9 conversation, Van Dyke told Detective Bearden about the night of the burglary and that he had tried to report his P320 as stolen, but the police did not believe him and arrested him. Detective Bearden asked Van Dyke to email him information about the missing guns and the paperwork for the P320. Van Dyke later emailed Detective Bearden that he felt it would be better for Detective Bearden to talk to Van Dyke's attorney, Dominick Marsala. Three days later, Detective Bearden spoke with Marsala, who sent him records regarding Van Dyke's purchase of the P320 and a copy of the letter Van Dyke had sent to the Denton County Sheriff reporting his guns as stolen.

On November 13, 2018, Detective Bearden spoke with Oak Point Police Department Detective Brian Howard, who explained that Van Dyke's story about the burglary seemed implausible given the surveillance footage and Marquardt's statements the night of the burglary. Detective Bearden spoke with Van Dyke again and asked him about Marquardt's statements. Van Dyke said that he had about 40 guns at his house, claimed that Marquardt did not know much about guns, and stated that he and Marquardt had been looking for some guns and hunting equipment

7

that day in the garage. Detective Bearden then asked for Marquardt's telephone number.[1] Van Dyke stated that he would have to consult with Marsala before giving out Marquardt's number. The next day, Marsala emailed Detective Bearden asking him to contact Marquardt through him.

On November 15, 2018, Momot was arrested for theft of a firearm.

On about December 14, 2018, the State charged Van Dyke by information with making a false report to a peace officer by intentionally and knowingly, with the intent to deceive, giving a false statement to Officer Roach that was material to the investigation, that is, that someone entered Van Dyke's truck without his consent and took his personal property. *See* Tex. Penal Code Ann. § 37.08(a)(1).

**D. The D.A.'s office and Marsala communicate about Momot's case.**

On December 17, 2018, the State received Momot's theft-of-a-firearm case. That same day, Marsala emailed Denton County Assistant District Attorney Kristin Kidd a copy of Van Dyke's polygraph results[2] and Detective Bearden's police report regarding the Momot investigation, which included details from Detective Bearden's conversations with Van Dyke and Marsala. About an hour later, ADA Kidd emailed Marsala the Denton Police Department's incident report regarding the recovery of the

---

[1]Marquardt and Van Dyke were no longer roommates.

[2]Van Dyke took and passed a polygraph examination "to determine certain facts concerning a police report regarding [his] burglarized vehicle."

8

P320 and Detective Bearden's investigation. The incident report and Detective Bearden's report contained nearly identical information.

### E. The DA's office emails Marsala discovery in Van Dyke's case, and Van Dyke calls his father from jail.

On January 10, 2019, ADA Kayla Hanes emailed Marsala discovery in the State's case against Van Dyke and stated that ADA Kidd had already emailed him the Denton Police Department's report.

Over the next two days, Van Dyke talked to his father from the Denton County Jail. Van Dyke told his father to tell Marquardt—who was staying at Van Dyke's house while taking care of Van Dyke's dogs—not to open the door and to "make himself scarce." The next day, Van Dyke's father confirmed that he "took care of that."

### F. The State amends the information against Van Dyke, and the trial court finds that Van Dyke wrongfully procured Marquardt's unavailability.

On about January 22, 2019, the State amended the information against Van Dyke to allege that he "with intent to deceive, knowingly [made] to [Officer] Roach, a peace officer conducting a criminal investigation, a false statement that was material to said criminal investigation, namely: that [Van Dyke] was the victim of a burglary of a motor vehicle" that occurred at about 10:30 p.m. on September 13, 2018. *See id.*

A few days later, after the State tried unsuccessfully to locate Marquardt for the upcoming trial, the State moved the trial court to find that Van Dyke had forfeited his right to object at trial to the admissibility of Marquardt's statements based on

9

Marquardt's unavailability because that unavailability was at least partially attributable to Van Dyke's actions. *See* Tex. Code Crim. Proc. Ann. art. 38.49 ("Forfeiture by Wrongdoing"). The trial court granted the motion, finding that Van Dyke had forfeited his right to confront Marquardt or to object to the admissibility of Marquardt's statements based on Marquardt's unavailability.

**G. Van Dyke prepares for his March 5, 2019 trial but ends up pleading no contest to making a false report to a peace officer.**

On February 4, 2019, Van Dyke moved for a hearing to determine the admissibility of his polygraph results. In his motion, Van Dyke stated that (1) when the information was filed against Van Dyke, Momot was being investigated for the theft of one of Van Dyke's guns; (2) after the theft, Momot was found in possession of one of Van Dyke's guns; (3) Momot knew that the gun was stolen; and (4) Momot was arrested for theft of a firearm. Van Dyke also filed subpoena applications for Detective Bearden and Momot.

But a week before his trial, pursuant to a plea-bargain agreement, Van Dyke pleaded nolo contendere to the offense of making a false report to a peace officer. In accordance with the plea-bargain agreement, the trial court placed Van Dyke on 24 months' deferred-adjudication probation.

**H. Momot is indicted for theft of a firearm, but he receives a favorable plea-bargain agreement because Van Dyke was the complaining witness.**

On March 12, 2019, a grand jury indicted Momot for theft of Van Dyke's firearm. ADA Sheila Bowles—who was initially assigned to Momot's case—explained

that she had presented the case to a grand jury because with Momot's admission that he purchased the P320 believing it was stolen, the facts of the case met the elements of theft of a firearm. *See* Tex. Penal Code Ann. § 31.03(a), (b)(2), (e)(4)(C). After Momot's indictment, ADAs Paul Hiemke and Lauren Marshall took over the case and realized that it would be problematic sponsoring Van Dyke as a witness because he had pleaded no contest to making a false report to a peace officer. The State thus offered Momot two years' deferred adjudication in exchange for his pleading guilty to class A misdemeanor theft. Momot's attorney asked if Momot could plead guilty to burglary of a motor vehicle instead. The State agreed. The State also agreed to Momot's attorney's request for 18 months' deferred adjudication instead of two years. Both ADAs Hiemke and Marshall stated that the disposition of Momot's case was not due to any realization or knowledge that Momot had in fact burglarized Van Dyke's vehicle but was a plea-bargain agreement to dispose of the case considering the problems with Van Dyke's credibility and his plea of no contest to making a false report to a peace officer.

The State moved to amend Momot's indictment to allege that, on or about September 28, 2018, Momot "did then and there, without the effective consent of Jason Vandyke [sic], the owner thereof, break into or enter a vehicle, namely an automobile or a part thereof, with intent to commit theft." *See id.* § 30.04(a). The trial court granted the motion. On July 11, 2019, Momot pleaded guilty to misdemeanor burglary of a motor vehicle, and the trial court—in accordance with the plea-bargain

11

agreement—deferred adjudicating his guilt and placed him on 18 months' community supervision.

## I. Van Dyke files an application for writ of habeas corpus, which the trial court denies, and Van Dyke appeals.

Van Dyke's habeas application challenged the trial court's deferred-adjudication order in his own case on two grounds: (1) the State failed to provide *Brady*[3] information, specifically that at the time of Van Dyke's plea, the State suspected Momot of burglarizing Van Dyke's vehicle, and (2) Momot's judicial admission that he had committed the crime that Van Dyke had pleaded no contest to falsely reporting was newly discovered evidence of Van Dyke's actual innocence.

The trial court denied habeas relief and made written findings of fact and conclusions of law. Van Dyke has appealed, raising five points. In his first three points, Van Dyke challenges specific fact findings, and in his fourth and fifth points, he complains that the trial court erred by denying relief on his habeas application.

## II. Standard of Review

Article 11.072 allows a defendant placed on deferred adjudication to challenge a community-supervision order by filing a request for habeas relief. *See* Tex. Code Crim. Proc. Ann. art. 11.072, § 1. An applicant seeking habeas relief under Article 11.072 has

---

[3]*Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

the burden of proving his claim by a preponderance of the evidence. *Ex parte Salim*, 595 S.W.3d 844, 853 (Tex. App.—Fort Worth 2020, no pet.) (citing *State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013)). We review the trial court's denial of habeas relief for an abuse of discretion. *Id.* (citing *Ex parte Mello*, 355 S.W.3d 827, 832 (Tex. App.—Fort Worth 2011, pet. ref'd)). We apply the *Guzman* standard to our review of the trial court's findings in an Article 11.072 appeal. *Guerrero*, 400 S.W.3d at 583 & n.18 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We defer almost completely to the trial court's "factual findings when supported by the record, especially when those findings are based upon credibility and demeanor." *Id.* This deferential review applies even when, as here, the findings are based on written evidence rather than on live testimony. *Id.* But we review de novo pure questions of law and application-of-law-to-fact questions that do not turn on credibility and demeanor. *Ex parte Beck*, 541 S.W.3d 846, 852 (Tex. Crim. App. 2017) (reviewing a postconviction Article 11.072 ruling).

### III. Van Dyke's Judicial Confession

In his first point, Van Dyke argues that the trial court erred by finding that he had judicially confessed to making a false report. The trial court incorporated that factual determination into findings 50 and 51, which concerned the reasoning behind the ADAs' plea decisions:

> 50. ADA Lauren Marshall and ADA Paul Hiemke found that Momot's actions met the elements of the felony offense of Theft of a Firearm, but

could not sponsor [Van Dyke] as a witness because he judicially confessed to making a false statement to a peace officer.

51. ADA Marshall and ADA Hiemke agreed with Momot's attorney to plea[d] Momot to a misdemeanor burglary of a motor vehicle, after prosecutors first offered a misdemeanor theft charge, in order to prevent the situation of a trial where the complaining victim of the case was impeachable due to the complaining witness'[s] judicial confession that he made a false statement to a peace officer.

Van Dyke contends that while his plea papers included a section entitled "Plea and Judicial Confession," they did not include an actual judicial confession. He therefore argues that to the extent that findings 50 and 51 refer to his judicial confession, they are erroneous and unsupported by the record.

To begin, it is worth noting that aside from the reference to Van Dyke's judicial confession of guilt, Van Dyke does not challenge the remaining content in these findings, which finds support in the record. ADA Marshall explained that "[t]he decision to offer a misdemeanor [to Momot] was made because the complaining witness in the felony Theft of a Firearm case was . . . Van Dyke[,] and we did not want to sponsor . . . Van Dyke as a witness." She further explained that "[t]he disposition of [Momot's] case was not due to any realization or any knowledge that Momot burglarized Van Dyke's vehicle," but "[t]he plea agreement was reached in order to dispose of Momot's case considering the complaining witness in the case pleaded to making a false report to a police officer." Similarly, ADA Hiemke stated in his affidavit that "[w]e knew this case would be a plea deal because of the issue of sponsoring Van Dyke as a witness when he had pleaded to making a false report to a

14

police officer." ADA Hiemke explained that the State had agreed to Momot's attorney's proposal that Momot plead guilty to burglary of a motor vehicle in exchange for 18 months' deferred adjudication because of the "problem of sponsoring Van Dyke as a witness." Like ADA Marshall, ADA Hiemke averred that the disposition of Momot's case "was not due to any realization or any knowledge that Momot burglarized Van Dyke's vehicle, but instead [was] a plea agreement in order to dispose of Momot's case considering the credibility of the victim in the case."

But even if the portions of fact findings 50 and 51 that refer to a judicial confession are unsupported by the record and we must thus reject them, those portions are irrelevant to the trial court's ultimate conclusion that Van Dyke was not entitled to habeas relief. Again, the thrust of Van Dyke's habeas application was that *Momot's admission* to committing the burglary was (1) invaluable, newly discovered evidence of his actual innocence and (2) evidence that the State should have disclosed under *Brady*. But the trial court's description of *Van Dyke's plea* as a judicial confession, even if erroneous, has no bearing on whether Momot's admission was material *Brady* evidence or newly discovered evidence of actual innocence. Because the disputed portions of the findings are immaterial to the merits, we need not consider whether they are supported by the record. *See Ex parte Reed*, 271 S.W.3d 698, 727–28 (Tex. Crim. App. 2008) (observing that the court of criminal appeals, as the reviewing court in a habeas proceeding could defer to phrases in a particular fact finding supported by the record, and reject those that were not); *Ex parte Yusafi*,

No. 09-08-00301-CR, 2008 WL 6740798, at \*1 (Tex. App.—Beaumont Aug. 26, 2009, pet. ref'd) (mem. op., not designated for publication) ("Should a given finding or conclusion be immaterial to the issue or irrelevant to our disposition, we may decline to consider said finding or conclusion and, instead, consider the findings and conclusions that are supported by the record and are germane to the resolution of the [Article 11.072] habeas appeal." (citing *Reed*, 271 S.W.3d at 728–29)).

Instead, we rely on the rest of the findings, which are supported by the record. Even if Van Dyke's no-contest plea was not a judicial confession, sponsoring Van Dyke as the complaining witness in a trial against Momot would have been problematic because of Van Dyke's inconsistent statements regarding the burglary. This supported ADA Marshall's and ADA Hiemke's decision to resolve Momot's case by reducing the charge from a felony to a misdemeanor by plea agreement. We thus overrule Van Dyke's first point.

## IV. Impeachment

In his second point, Van Dyke challenges fact finding 43: "[Van Dyke]'s plea to the offense [of making a false report to a peace officer] made him impeachable as a witness in any trial against Momot." Van Dyke argues that the trial court erred by making this finding because Van Dyke's plea did not result in a conviction.

Van Dyke argues—and the State concedes—that because deferred adjudication is not a conviction, it cannot be used to impeach a witness under Texas Rule of Evidence 609(a). *See* Tex. R. Evid. 609(a) (providing that, under certain circumstances,

16

evidence of a criminal conviction offered to attack a witness's character for truthfulness is admissible). Deferred adjudication is admissible, however, to show a witness's bias, motive, or ill will emanating from the witness's deferred-adjudication status. *See Juneau v. State*, 49 S.W.3d 387, 389–90 (Tex. App.—Fort Worth 2000, pet. ref'd) (citing *Callins v. State*, 780 S.W.2d 176, 196 (Tex. Crim. App. 1989) (op. on reh'g)); *Moreno v. State*, 944 S.W.2d 685, 690 (Tex. App.—Houston [14th Dist.] 1997), *aff'd*, 22 S.W.3d 482 (Tex. Crim. App. 1999).

Van Dyke argues that there is no evidence that his testimony in Momot's trial would have been impeachable because of his deferred-adjudication status. But if Momot (or the State) made the required showing at Momot's trial that Van Dyke's testimony was the result of bias, motive, or ill will resulting from his deferred-adjudication status, that status could be used to impeach Van Dyke. *See Juneau*, 49 S.W.3d at 390. Because Van Dyke's deferred-adjudication status was a possible basis to impeach Van Dyke, the trial court did not abuse its discretion by finding that Van Dyke's no-contest plea made him impeachable as a witness in Momot's trial. We overrule Van Dyke's second point.

**V. Prosecutors' Awareness of Evidence Linking Momot to Van Dyke's Truck**

In his third point, Van Dyke contends the trial court erred by making the following fact finding:

> 52. At the time of Momot's plea on July 11, 2019, prosecutors were not aware of any evidence linking Momot to [Van Dyke]'s vehicle other than Momot's possession of the firearm.

17

Van Dyke argues that the trial court abused its discretion by making this finding because at the time of Momot's plea, the State—by drafting and endorsing plea papers for burglary of a motor vehicle—took the position that Momot had committed the crime that Van Dyke was accused of falsely reporting. He further argues that judicial estoppel—which "prohibits a party who has taken a position in an earlier proceeding from subsequently taking a contrary position"—bars the State from now arguing that the crime Van Dyke reported did not actually occur. *Hall v. State*, 283 S.W.3d 137, 156 (Tex. App.—Austin 2009, pet. ref'd) (op. on reh'g). He also contends that the prosecutors committed misconduct by filing and sponsoring false papers in Momot's case because the Texas Disciplinary Rules of Professional Conduct prohibit (1) a lawyer from knowingly making a false statement to a tribunal; (2) a lawyer from knowingly offering evidence that the lawyer knows to be false; and (3) a prosecutor in a criminal case from prosecuting or threatening to prosecute a charge that the prosecutor knows is not supported by probable cause. *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.03(a)(1), (a)(5), 3.09(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A. (Tex. State Bar R. art. X, § 9).

"Judicial estoppel precludes a party who successfully maintains a position in one proceeding from afterwards adopting a clearly inconsistent position in another proceeding to obtain an unfair advantage." *Ahmad v. State*, 295 S.W.3d 731, 741 (Tex. App.—Fort Worth 2009, pet. ref'd) (op. on reh'g). The doctrine's essential function is to prevent litigants from taking contradictory positions in successive proceedings.

18

*Hall*, 283 S.W.3d at 156. It is not intended to "punish inadvertent omissions or inconsistencies but rather to prevent parties from playing fast and loose with the judicial system for their own benefit." *Ahmad*, 295 S.W.3d at 741.

Here, Van Dyke's plea and the State's offering Momot 18 months' deferred adjudication in exchange for pleading guilty to burglary of a motor vehicle are not contradictory or inconsistent. Simply put, Momot could have burglarized Van Dyke's vehicle but not at the time or in the manner Van Dyke claimed to Officer Roach that it had happened. *See generally* Tex. Penal Code Ann. § 37.08(a)(1) ("A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to . . . a peace officer . . . conducting the investigation . . . .").

Moreover, to the extent Van Dyke challenges whether the finding is supported, the record bears it out. The evidence shows that prior to the plea negotiations, the State's only evidence linking Momot to Van Dyke's vehicle was Momot's possession of Van Dyke's P320, which Momot maintained he had purchased from a friend of a friend. And because of the problems with sponsoring Van Dyke as a witness, the State agreed to plead Momot to burglary of a motor vehicle. The trial court thus did not abuse its discretion in making fact finding 52. We overrule Van Dyke's third point.

19

## VI. Van Dyke's *Brady* Violation Claim

In his fourth point, Van Dyke argues that the trial court erred by denying him habeas relief because the State failed to disclose exculpatory evidence, specifically that at the time of his no-contest plea, the State believed that Momot had burgled Van Dyke's truck. Had the State disclosed this material evidence, Van Dyke contends that he would have "gone to trial instead of pleading no contest."

To establish his *Brady* claim, Van Dyke was required to show that (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence was favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the trial's outcome would have been different. *See Ex parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012). Favorable evidence includes exculpatory evidence and impeachment evidence. *Ex parte Chaney*, 563 S.W.3d 239, 266 (Tex. Crim. App. 2018). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ex parte Lalonde*, 570 S.W.3d 716, 724 (Tex. Crim. App. 2019) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985)).

Here, at the time of Van Dyke's no-contest plea a week before his March 5, 2019 trial setting, the State had disclosed to Van Dyke all the evidence in its possession about Momot's case. At that time (and at any time for that matter), the only evidence the State had linking Momot to Van Dyke's vehicle was Momot's possession of Van Dyke's P320. And Momot maintained that he had bought the gun

20

from a friend of a friend, knowing that it was stolen. The State had disclosed this evidence to Van Dyke on December 17, 2018, when ADA Kidd sent Marsala the Denton Police Department's incident report regarding the recovery of the P320 and Detective Bearden's investigation. At that time, Marsala was already in possession of Detective Bearden's police report regarding his investigation leading to Momot's arrest. Additionally, Van Dyke had been aware that his P320 was recovered from Momot as early as November 9, 2018, when Detective Bearden first contacted him about the gun. There is no evidence that at the time of Van Dyke's plea, the State had any additional or particular information linking Momot to the burglary of Van Dyke's truck. Accordingly, the trial court did not err by denying Van Dyke habeas relief based on his *Brady* claim, and we thus overrule his fourth point.

## VII. Van Dyke's Actual-Innocence Claim

In his fifth point, Van Dyke argues that the trial court erred by denying him habeas relief because Momot's confession to burgling Van Dyke's truck was newly discovered evidence that proved Van Dyke was actually innocent.

Establishing an actual-innocence claim is a Herculean task. *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006). When asserting an actual-innocence claim based on newly discovered evidence, a habeas applicant must show (1) by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence and (2) that the evidence the applicant relies upon is "newly discovered"

or "newly available," meaning it was not known to the applicant at the time of trial and could not have been known to the applicant even with the exercise of due diligence. *Id.* The showing under the first prong "must overcome the presumption that the conviction is valid[,] and it must unquestionably establish [the] applicant's innocence." *Id.*

Here, Van Dyke's newly discovered evidence is Momot's judicially confessing and pleading guilty to burglarizing Van Dyke's truck. But the State's case against Van Dyke did not depend on whether Momot had actually burglarized Van Dyke's truck; it was based on Van Dyke's statements to Officer Roach regarding the burglary. Momot's guilty plea is thus not necessarily inconsistent with Van Dyke's false report to Officer Roach that he "was the victim of a burglary of a motor vehicle that occurred" at about 10:30 p.m. on September 13, 2018. As noted, Van Dyke's truck might have been burglarized, and it might have been burglarized by Momot, just not in the manner Van Dyke claimed to Officer Roach. And although Momot pleaded guilty to burglarizing Van Dyke's vehicle, the evidence against Van Dyke showed that he made inconsistent statements to Officer Roach and to others regarding the burglary's details, and the trial court in Van Dyke's case ruled that Van Dyke had forfeited his right to confront Marquardt or to object to the admissibility of Marquardt's statements based on his unavailability. Moreover, the surveillance video footage from Van Dyke's neighbor contradicted Van Dyke's version of events.

22

Assuming that Momot's plea is newly discovered evidence, we conclude that Van Dyke did not show by clear and convincing evidence that no reasonable juror could have found him guilty in light of Momot's guilty plea. We thus overrule Van Dyke's fifth point.

## VIII. Conclusion

Having overruled Van Dyke's five points, we affirm the trial court's order denying Van Dyke's Article 11.072 application for writ of habeas corpus.

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 15, 2020