

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00077-CR

———————————————

EX PARTE PARRY JUARA

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. C-396-W011871-1520678-AP

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

In two issues, Appellant Parry Juara challenges the trial court's denial of his application for writ of habeas corpus through which he sought relief under the procedure specified in Article 11.072 of the Texas Code of Criminal Procedure. Juara sought habeas relief predicated on a claim that he had received ineffective assistance of counsel when he pleaded guilty to a drug-possession charge because his plea counsel failed to advise him that a guilty plea would lead to his deportation. To sustain this claim, Juara bore the burden of proving (1) that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) that he was prejudiced as a result of counsel's errors, in that, but for those errors, there is a reasonable probability that he would have not pleaded guilty. *See Strickland v. Washington*, 466 U.S. 668, 687, 693, 104 S. Ct. 2052, 2064, 2067–68 (1984).

In his first issue, Juara claims that the trial court erred by concluding that his plea counsel's performance was not deficient because "the deportation consequence of [his] guilty plea was not truly clear." We do not reach this issue. *See* Tex. R. App. P. 47.1.

In his second issue, Juara argues that the trial court erred by failing to consider the totality of the circumstances when it determined that Juara was not prejudiced by his counsel's performance. Juara's narrow attack is wrong on the facts and does not

persuade us that the trial court abused its discretion by finding that Juara failed to prove that he was prejudiced.

Because Juara failed to make one of the required showings to obtain relief, we affirm the trial court's order denying habeas relief.

## II.  Factual and procedural background

### A.  The grounds that Juara asserted as a basis for habeas relief

Juara filed an application for writ of habeas corpus invoking Article 11.072 of the Texas Code of Criminal Procedure—the writ procedure that applies when a defendant has been placed on community supervision after a guilty plea.  *See* Tex. Code Crim. Proc. Ann. art. 11.072.  In the application, Juara sought relief from the consequences of his prior guilty plea to the charge of possessing cocaine in an amount of less than one gram.  The general basis for relief stated in Juara's writ application is as follows:  "Juara did not enter his plea of guilty knowingly, voluntarily, or intelligently.  Juara did not receive the effective assistance of counsel during plea negotiations."  Juara alleged that the advice given to him by his plea counsel was inadequate because Juara was not informed of the immigration consequences of a guilty plea.

### B.  The procedural path that Juara's writ application took

The State responded to Juara's application, and a magistrate conducted a hearing on the application.  The magistrate adopted the findings of fact and

3

conclusions of law submitted by the State. In turn, the trial court adopted the actions of the magistrate. Juara then appealed to this court.

### C. The trial court's findings that detailed why it denied Juara habeas relief

The findings and conclusions are lengthy and detailed; there are ninety-seven findings of fact and thirty-eight conclusions of law. Because of the detail contained in the findings, we will rely on them heavily to describe the factual background of this matter.

The findings outline the underlying facts of the charge to which Juara had pleaded guilty and for which he was placed on community supervision. The findings also outline the background and the procedural facts of the writ process.

#### 1. The findings that address the testimony of immigration counsel

The findings detail the testimony of an immigration lawyer whom Juara's family retained to fight a deportation proceeding initiated against him. Immigration counsel had represented Juara in a deportation proceeding before an immigration judge and a subsequent appeal of an "order of removal" to the Board of Immigration Appeals, an appeal that Juara lost. Immigration counsel described the likelihood of deportation under federal law should a defendant plead guilty to a state drug charge.

Most of immigration counsel's testimony outlined differences between offenses for possession of cocaine under Texas law and federal law and how those differences impact whether a guilty plea to a Texas possession charge triggers deportation.

4

Generally, immigration counsel testified that deportation based on a state conviction for possession of a controlled substance is not automatic because "[u]nder United States immigration law, a person is made deportable by a conviction for a drug offense only if the applicable drug has an analogue in the federal Schedule of Controlled Substances." This principle impacts a person convicted of a Texas offense for cocaine possession because the schedule of controlled substances in Texas law contains one type of cocaine not listed in the federal schedule of controlled substances. The Texas schedule includes position isomers of cocaine while the federal schedule does not. *Compare* Tex. Health & Safety Code Ann. § 481.102(3)(D)(i), *with* 21 U.S.C.A. § 812(c), Schedule II(a)(4).

Immigration counsel testified that this clash between Texas law and federal law has a direct impact on whether a guilty plea to a Texas cocaine possession charge would cause a defendant to be deported. If a person challenging deportation on the basis of a drug conviction can show that Texas actually prosecutes for possession of the type of cocaine not listed in the federal schedule, a "conviction for possession of cocaine would be rendered non-deportable under [what immigration counsel described as] the categorical approach established by the Supreme Court." But immigration counsel noted that the categorical approach is not as helpful to a defendant as it appears; in 2020, the Fifth Circuit held that a person challenging deportation would have a nearly impossible task to show that Texas actually prosecutes possession of its unique category of cocaine because there were no citable

5

decisions on the issue and because a charging document under Texas law need not specify the particular type of cocaine a defendant possessed. *See Alexis v. Barr*, 960 F.3d 722, 729 (5th Cir.), *cert. denied*, 141 S. Ct. 845 (2020).

Immigration counsel, however, had discovered two cases in Dallas County indicating that defendants were being prosecuted under Texas law for possession of the unique category of cocaine.[1] That discovery appears to have come after Juara's initial immigration proceeding, but in response to the discovery of the Dallas cases, immigration counsel filed a motion to remand with the Board of Immigration Appeals. The Board denied the motion.

The findings highlight how the complexion of the advice on the immigration consequences of deportation had changed from the time of Juara's plea as the law had evolved and how an earlier discovery of the Dallas cases might have impacted Juara's deportation proceeding had he known of them in time to present them to the immigration judge who originally heard his immigration proceeding. The ultimate finding on immigration counsel's testimony was that "[t]here is evidence that the immigration consequences of [Juara]'s conviction for possession of cocaine were not 'truly clear.'"

---

[1] Immigration counsel did not name the two Dallas County cases in his affidavit.

## 2. The findings that address the timing of developments in immigration law that impacted Juara's immigration status

The findings explicitly deal with the timing of the developments in the law that impacted the question of whether Juara's plea triggered his deportation and why the trial court ultimately concluded that the law was not "truly clear" at the time of his plea:

69. At the time of [Juara]'s plea, the two cases used to demonstrate that Texas prosecuted cases involving [the type of cocaine listed on the Texas schedule] did not exist.

70. It is not certain whether there existed cases which demonstrate that Texas prosecuted cases involving [the type of cocaine listed on the Texas schedule] at the time of [Juara]'s plea.

71. At the time of [Juara]'s plea, the Fifth Circuit case which recognized that the Texas definition of cocaine was facially broader than the federal definition had not yet been decided. *Alexis*[, 960 F.3d at 729].

72. The categorical approach to determining whether a state offense is deportable because it is also a federal offense was established long before [Juara]'s 2018 guilty plea.

73. At the time of [Juara]'s plea, the Texas definition of cocaine included [the type of cocaine listed on the Texas schedule] and was thus broader than the federal definition, as it is now. *Compare* 21 U.S.C.[A.] §§ 802(14) (effective July 22, 2016 to Oct. 23, 2018), 812 [Schedule] II(a)(4) (effective July 9, 2012 to Dec. 19, 2018), *with* Tex. Health & Safety Code § 481.102(3)(D) (effective Sept. 1, 2017).

74. Even if the law were settled at the time of [Juara]'s plea, there was still a chance that an immigration attorney could have found a case [in which] the State prosecuted an offense involving [the type of cocaine listed on the Texas schedule].

7

75. Thus, even at the time of [Juara]'s plea, deportation was not a "truly clear" consequence of his guilty plea from an immigration law perspective. [Record references omitted.]

### 3. The findings that address Juara's testimony

Juara had filed an inmate declaration in support of his writ application and also testified at the writ hearing. The findings describe Juara as a native of India who immigrated to the United States in 2013. Juara's parents immigrated to the United States in 2010, and his parents, sister, and sister's family live in Arlington, Texas. Juara has been employed as a truck driver while in the United States. The findings note that Juara "was able to communicate his testimony effectively without the aid of an interpreter."

The findings outline how Juara came to retain plea counsel, what advice Juara contends his plea counsel gave or failed to give him on the immigration consequences of his plea, how and when he learned of those consequences, and his contention that he would not have pleaded guilty had he known that a guilty plea would affect his immigration status:

18. After [Juara] was arrested for possession of cocaine, a friend gave him the phone number of [plea counsel], the attorney who would later represent him.

19. [Juara] testified that he met with [plea counsel] one time in his office or home and a few times in court when his cases were reset.

20. [Juara] claims that although [plea counsel] knew that [Juara] was not a United States citizen, he never discussed immigration with [Juara].

21. [Juara] testified that [plea counsel] never even mentioned the word "immigration" in [Juara]'s presence.

22. [Juara] claims that he did not understand that his plea to possession of cocaine could affect his immigration status because he did not speak English and [because plea counsel] never obtained an interpreter.

23. [Juara] testified at the writ hearing that he did not know immigration would be an issue until after he was placed on probation when a friend told him that he could not get citizenship while he was on probation.

24. In his declaration, [Juara] stated that he first learned of immigration consequences when the judge mentioned it at the plea proceedings.

25. [Juara] testified that if he had known receiving probation would affect his immigration status, he would have pleaded not guilty and "fought the case." [Record references omitted.]

The findings then outline Juara's recollection of the proceeding when he pleaded guilty and highlight variances between what he claimed occurred at the hearing and what the record of the hearing bore out:

26. When shown the written plea admonishments during cross[-] examination, [Juara] admitted that his signature was on the document but claimed he did not remember what it was.

27. [Juara] admitted that the plea paperwork contained his signatures but claimed that he did not remember signing it.

28. [Juara] stated that he did not remember reading the waivers of his rights on page four of the plea admonishments.

29. When directed to the specific plea admonishment about citizenship status, [Juara] stated that the "Judge did that," presumably referring to the notations made near that admonishment.

9

30. [Juara] remembered talking to the judge about what country he was from.

31. After being pressed on the issue, [Juara] admitted that the judge informed him about potential immigration consequences of his guilty plea.

32. [Juara] remembered the judge telling him that he might be deported.

33. [Juara] did not raise any immigration issues at the plea hearing.

34. [Juara] did not tell the judge at the plea hearing that he did not want to be deported.

35. [Juara] admitted that he did not tell [plea counsel] that he did not want to be deported even when he claimed that he learned of that possibility.

36. [Juara] admitted that he did not tell his "uncle" (his sister's neighbor), who was at the hearing with him, that he did not want to be deported.

37. [Juara] did not explain why he [had] failed to speak up about the immigration issue when he became aware of it before he pleaded guilty.

38. At the writ hearing, [Juara] was able to understand the questions that were asked of him and answer them appropriately without an interpreter.

39. When asked specifically about when the trial court informed him about immigration consequences, [Juara] seemed to only remember after being pressed, and he only admitted to remembering after he was asked a direct, leading question about it.

. . . .

43. Although [Juara] claimed that he would have pleaded not guilty if he had known that his plea could affect his immigration status,

10

he d[id] not explain why he did not change his plea when the judge informed him about potential immigration consequences except to simply say that he was surprised and "didn't know what to do." [Record references omitted.]

The findings also set forth Juara's connections to the United States and the consequences of his deportation as follows:

40. Aside from stating that a few of his family members live in the United States, [Juara] never explained why deportation is a particularly severe consequence for him.

41. [Juara] testified that members of his family have gone back to India to visit.

42. [Juara] never claimed that he would be unable to see his family if he were deported. [Record references omitted.]

### 4. The findings that address the trial court's admonishments when Juara pleaded guilty

The trial court also made specific findings about the admonishments given to Juara when he pleaded guilty and the impact those admonishments had on the question of Juara's credibility:

44. At the time of his plea, the trial court admonished [Juara] according [to] the procedures laid out in Texas Code of Criminal Procedure [A]rticle 26.13.

45. The trial court noted that [Juara] was not a United States citizen and handwrote [Juara]'s native country, India, on the plea paperwork.

46. The initials next to the citizenship admonishment, GG, stand for George Gallagher[, the trial judge]. The trial court wrote those initials on the plea admonishment.

11

47.   At the plea hearing, this Court informed [Juara] that he could be deported or denied naturalization if he pleaded guilty to the offense.

48.   [Juara]'s claim[—]that he would have pleaded not guilty and insisted on going to trial if he were informed of the immigration consequences of his plea[—]is not credible.   [Record references omitted.]

### 5.     The findings that address the testimony of plea counsel

Juara's plea counsel filed an affidavit outlining the advice that he had given Juara and his conclusions about the strength of the State's case against Juara on the possession charge to which he pleaded guilty.  In essence, these findings indicate that plea counsel had advised Juara about immigration consequences, even though such advice was faulty, and that plea counsel had opined that the State had a strong case against Juara on the cocaine possession charge:

79.   When [plea counsel] was informed of [Juara]'s immigration status, he informed [Juara] that he did not know much about [i]mmigration [law].

80.   [Plea counsel] advised [Juara] that any result "other than a dismissal or a not guilty could and *probably would* have serious repercussions including deportation."

81.   [Plea counsel] admit[ted] that he did not inform [Juara] that deportation would be mandatory if [Juara] pleaded guilty.

82.   [Plea counsel] advised [Juara] multiple times to contact an immigration attorney to discuss [Juara]'s cases.

83.   [Plea counsel] believes that [Juara] told him that [Juara] had access to advice from an immigration attorney.

84.   When he was hired, [plea counsel] attempted to fight [Juara]'s drug possession charge by filing a motion to suppress.

85. After the motion to suppress was denied, [plea counsel] determined that if [Juara]'s case went to trial, "a guilty verdict was at the very least highly probable if not guaranteed."

86. The State had a very strong case against [Juara].

87. [Plea counsel] determined that the best option was for [Juara] to give an open plea of guilty to the court and request deferred[-] adjudication community supervision.

88. [The trial court] granted [Juara]'s request and placed him on deferred[-]adjudication community supervision for two years.

89. [Plea counsel] admits in his affidavit that his understanding of immigration law was faulty.

90. [Plea counsel]'s affidavit is credible and [is] supported by the record.

91. [Juara]'s claim that [plea counsel] never discussed immigration consequences with him is not credible. [Record references omitted.]

## 6.     The general findings that were made by the trial court

After the plethora of findings outlined above, the findings conclude with what are apparently the ultimate findings based on those specifics:

92. There is evidence that [Juara] was aware that his guilty plea could and likely would result in his eventual deportation.

93. There is no evidence to suggest that [Juara] ever attempted to consult an immigration attorney despite [plea counsel's] advice and his statement to [plea counsel] that he had access to an immigration attorney.

94. [Juara]'s decision to not consult an immigration attorney despite being advised multiple times that he should do so to be fully aware of the immigration consequences of his plea is evidence that

13

[Juara] was not as concerned with deportation at the time of his plea as he now claims.

95. [Juara] presents no contemporaneous evidence that he would have pleaded not guilty and insisted on going to trial if his attorney had advised him differently.

96. [Juara]'s claim[—]that he did not state concern regarding immigration consequences because he was not advised about them[—] lacks evidentiary support.

97. [Juara]'s claim[—]that he would have pleaded not guilty and insisted on going to trial if his trial attorney [had] advised him that deportation would be an automatic result of his guilty plea[—]lacks credibility.  [Record references omitted.]

### III.  Analysis

**A.  The difference between a proceeding under Article 11.072 and a proceeding under Article 11.07 and the standard of review that we apply**

As noted above, Juara filed his application for writ of habeas corpus under Article 11.072 of the Code of Criminal Procedure, which provides a writ procedure "in a felony or misdemeanor case in which the applicant seeks relief from an order or a judgment of conviction ordering community supervision."  Tex. Code Crim. Proc. Ann. art. 11.072, § 1; *State v. Guerrero*, 400 S.W.3d 576, 582 (Tex. Crim. App. 2013) ("Article 11.072 is 'the exclusive means by which the district courts may exercise their original habeas jurisdiction under Article V, Section 8, of the Texas Constitution in cases involving an individual who is either serving a term of community supervision or who has completed a term of community supervision.'").

There is a procedural distinction between an Article 11.072 writ and the more often utilized writ procedure found in Article 11.07 of the Code of Criminal Procedure—a distinction central to our disposition of this appeal. This distinction focuses on how factual findings made by the trial court are addressed by an appellate court. In the Article 11.07 context, the Court of Criminal Appeals is "the ultimate finder of fact"; though it may accept the findings made by the trial court, they are not automatically binding on that court. *Ex parte Garcia*, 353 S.W.3d 785, 787–88 (Tex. Crim. App. 2011). The same is not true of an Article 11.072 proceeding. As the Court of Criminal Appeals recently emphasized,

> Unlike Article 11.07 cases where our court is the ultimate finder of fact, in Article 11.072 cases, the trial court is the sole finder of fact, and the reviewing court acts only as an appellate court. Even for an appellate court, some issues in an Article 11.072 case are subject to *de novo* review, but not everything is. Findings of historical fact made at the trial level are still given deference on appeal even when the findings are based solely on affidavits.

*Ex parte Sanchez*, 625 S.W.3d 139, 144 (Tex. Crim. App. 2021) (footnotes omitted); *see also Ex parte Torres*, 483 S.W.3d 35, 42 (Tex. Crim. App. 2016) (stating that in an Article 11.072 proceeding, appellate court defers to findings made by the trial court that are supported by the record, "especially when those findings are based upon credibility and demeanor").

Thus, we apply a standard of review with the following parameters:

> An applicant seeking habeas relief under Article 11.072 bears the burden of proving his claim by a preponderance of the evidence. . . . *Guerrero*, 400 S.W.3d [at] 583 . . . . Normally, we review the trial court's decision

15

denying habeas relief for an abuse of discretion. *Ex parte Mello*, 355 S.W.3d 827, 832 (Tex. App.—Fort Worth 2011, pet. ref'd). We apply the *Guzman* standard to our review of the trial court's findings in an Article 11.072 appeal. *Guerrero*, 400 S.W.3d at 583 & n.18 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We defer almost completely to the trial court's "findings [of fact] . . . supported by the record, especially when those findings are based upon credibility and demeanor." *Id.* This deferential review applies even when, as here, the findings are based on written evidence rather than on live testimony. *Id.* However, we review de novo pure questions of law and application-of-law-to-fact questions that do not turn on credibility and demeanor. *Ex parte Beck*, 541 S.W.3d 846, 852 (Tex. Crim. App. 2017) (reviewing a postconviction Article 11.072 ruling); *Ex parte Duque*, 540 S.W.3d 136, 148 (Tex. App.—Houston [1st Dist.] 2017)[,] *pet. struck*, No. PD-1135-17, 2018 WL 344321, at *1 (Tex. Crim. App. Jan. 10, 2018) (per curiam order) (not designated for publication).

*Ex parte Salim*, 595 S.W.3d 844, 853 (Tex. App.—Fort Worth 2020, no pet.) (mem. op.).

## B. The general principles that we apply to an ineffective-assistance-of-counsel claim

Here, Juara attacks his conviction relying on a claim of ineffective assistance of counsel, arguing that his plea was not voluntarily and knowingly made. It is axiomatic that a criminal defendant has the right to a jury trial. *Munoz v. State*, No. 01-18-00882-CR, 2020 WL 1584480, at *5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2020, pet. ref'd) (mem. op., not designated for publication). When deciding to forego that right by pleading guilty, a defendant must have received the effective assistance of competent counsel in making that decision. *Id.*

The standard to determine whether a counsel's assistance was ineffective is as follows:

16

To demonstrate that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel, [a writ] applicant must demonstrate that (1) counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) the applicant was prejudiced as a result of counsel's errors, in that, but for those errors, there is a reasonable probability of a different outcome.

*Torres*, 483 S.W.3d at 43 (citing *Strickland*, 466 U.S. at 687, 693, 104 S. Ct. at 2064, 2067–68). The focus of the prejudice prong involving a collateral attack on a guilty plea is "'whether counsel's constitutionally ineffective performance affected the outcome of the plea process[]' and . . . whether a defendant has shown that 'but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* (quoting *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985)).

> **C.** **The factors that we apply on the question of whether plea counsel failed to provide adequate advice to a defendant whose guilty plea might cause him to be deported**

Counsel's assistance may be deficient and a defendant's Sixth Amendment right to counsel violated when counsel fails to provide adequate advice that a guilty plea will impact a defendant's immigration status. *Id.* (citing *Padilla v. Kentucky*, 559 U.S. 356, 369, 130 S. Ct. 1473, 1483 (2010)). For counsel to adequately represent a client subject to a risk of deportation, counsel "must advise her client regarding the risk of deportation" that may result from a guilty plea. *Id.* at 44. But how categorical counsel's advice must be on the immigration consequences of the plea turns on whether federal immigration law is clear on what those consequences will be:

There will[] . . . undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain.

17

> The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward[,] . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear . . . , the duty to give correct advice is equally clear.

*Id.* (quoting *Padilla*, 559 U.S. at 369, 130 S. Ct. at 1483). When deportation is a clear consequence of a guilty plea, counsel's advice must also be clear: "[c]ounsel[] [is] obligated to inform appellant of the 'presumptively mandatory' immigration-law consequences of his plea that would make him 'subject to automatic deportation.'" *Id.* at 45 (quoting *Padilla*, 559 U.S. at 369, 130 S. Ct. at 1483).

### D. The factors that we apply to the question of whether inadequate advice on the immigration consequences of a guilty plea prejudiced a defendant

Again, the overarching question when deciding whether deficient advice from counsel on the immigration consequences of a guilty plea prejudiced a defendant is whether the defendant proved a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Munoz*, 2020 WL 1584480, at *6 (quoting *Hill*, 474 U.S. at 59, 106 S. Ct. at 370).

To make a convincing case of prejudice, a defendant must persuade the trial court that if the clock could be turned back to the time of the guilty plea and if he had been given the proper advice on the immigration consequences of a guilty plea, he would have rolled the dice by going to trial. Courts recognize that a defendant's fear of permanent exclusion from this country by deportation may outweigh the fear of

being imprisoned for a finite term. *Id.* But the understandable incentive to testify that one would not have pleaded guilty "if he knew then what he knows now" makes courts leery of relying on this change of heart to overturn a plea. In the United States Supreme Court's words, "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). Instead, courts should assay "contemporaneous evidence [at the time of the plea] to substantiate a defendant's expressed preferences." *Id.* The Court of Criminal Appeals' statement of its general standard is "where the totality of the circumstances indicate[s] that a defendant has placed a particular emphasis on the immigration consequences of a plea in deciding whether or not to accept it, this may constitute a circumstance that weighs in favor of a finding of prejudice." *Torres*, 483 S.W.3d at 48–49.

In *Munoz*, the First Court of Appeals recently summarized what factors a trial court should weigh in deciding whether a defendant has made a convincing case that with proper counsel on the immigration consequences of a plea, he would have opted to go to trial:

- "[A] defendant generally must show that a decision to reject the plea bargain would have been rational under the circumstances." 2020 WL 1584480, at *6. The risk of a guilty verdict because the evidence of guilt is overwhelming weighs against a finding of prejudice. *Id.* But if the defendant attempted to withdraw his plea before the writ proceeding

and "asserted his interest to go to trial, proclaiming innocence," that is a factor relevant to the prejudice analysis. *United States v. Kayode*, 777 F.3d 719, 728 (5th Cir. 2014).

- "Another factor in the analysis is the defendant's connection to the United States." *Munoz*, 2020 WL 1584480, at *6. Obviously, the stronger the ties to this country, the more likely a defendant is to gamble on a positive outcome at trial to preserve such ties.

- Judicial admonishments as part of the plea process are considered. *Id.* "[W]hile judicial admonishments are not a substitute for effective assistance of counsel, they are relevant under the second *Strickland* prong in determining whether a defendant was prejudiced by counsel's error." *Kayode*, 777 F.3d at 728–29.

- But it is not the defendant's burden to establish that had he gone to trial, "the likely outcome of the jury trial he waived would have been more favorable." *Munoz*, 2020 WL 1584480, at *6. Unlike the analysis of an ineffective-assistance claim coming after a jury has found a defendant guilty, there is no "presumption of reliability" with a guilty plea because no judicial proceeding has occurred. *Id.* at *7 (citing *Lee*, 137 S. Ct. at 1965). In other words, a defendant is not required to prove the

unprovable—what result the vagaries of trial would have likely produced in his case.

*Munoz* also discussed the United States Supreme Court's most recent decision on an ineffective-assistance claim based on flawed advice on the immigration consequences of a guilty plea. *Id.* (citing *Lee*, 137 S. Ct. at 1965). As noted above, *Lee* held that a court should test a defendant's claim that he would have taken his chances with the jury based on contemporaneous evidence rather than *post hoc* assertions at the writ hearing. 137 S. Ct. at 1967. But *Lee* rejected a wooden rule that precluded relief if the defendant could not establish that he had a viable defense to the charge to which he pleaded guilty. *Id.* at 1966. In the unique circumstance where there was "substantial and uncontroverted evidence" of the defendant's concerns about whether a guilty plea would cause him to be deported and counsel's erroneous assurance that he would not be deported, the Supreme Court concluded that the defendant had established the reasonable probability that he would have gambled on the slim hope produced by the almost certainty of being deported after a guilty verdict at trial versus the certainty of being deported after a guilty plea. *Id.* at 1969–70.

E.    **Why we reject Juara's issue contending that the trial court erred by finding that he was not prejudiced by his plea counsel's allegedly ineffective assistance of counsel**

The trial court's findings note the complexity of the question regarding whether the immigration consequences at the time of Juara's plea were truly clear, what advice was required of plea counsel on whether the guilty plea would trigger deportation, and

the impact of plea counsel's concession that his understanding of the law was flawed. But we will not answer the question regarding whether plea counsel's representation was deficient. *See* Tex. R. App. P. 47.1.

We may resolve an ineffective-assistance claim by assuming that counsel gave deficient advice on the immigration question but that the advice did not prejudice the defendant. *Torres*, 483 S.W.3d at 51.[2] Juara's attack on the trial court's overall assessment of whether he suffered prejudice from counsel's arguably flawed immigration advice takes a chop at a few of the poles supporting the trial court's conclusion but leaves the overall structure standing.[3]

---

[2]In *Torres*, the Court of Criminal Appeals held that

> [a]lthough we agree with the court of appeals's holding as to the deficient-performance prong of a *Strickland* analysis in this case based on counsel's failure to provide accurate advice regarding the truly clear deportation consequence of appellant's guilty plea, we disagree with its assessment as to the matter of prejudice, in view of the lack of any evidence from appellant as to how he was prejudiced and in the absence of any credible facts in the record showing that, but for counsel's erroneous advice, appellant would have rationally decided to reject the plea bargain and instead pursue a trial.

*Id.*

[3]The trial court's conclusions of law on the prejudice issue are set forth below without alteration to the case citations:

> 28.   In a *Padilla* claim, the applicant must show that "but for counsel's errors, the applicant would have rejected the plea bargain and instead pursued a trial." *Ex [p]arte Torres*, 483 S.W.3d 35, 46 (Tex. Crim. App. 2016) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

29. It is not appropriate to presume that [Juara] was prejudiced by counsel's errors, even in a *Padilla* claim. *Ex [p]arte Torres*, 483 S.W.3d 35, 46–47 (Tex. Crim. App. 2016).

30. "Courts should not upset a plea solely because of [*post hoc*] assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017).

31. When avoiding deportation is a primary concern for the defendant at the time of his plea, and he pleaded guilty based on counsel's erroneous advice that the conviction would not support deportation, the defendant "has demonstrated a 'reasonable probability that, but for [his] counsel's errors, he would not have pleaded guilty and would have insisted on going to trial'" regardless of his chances at trial. *Lee v. United States*, 137 S. Ct. 1958, 1969 (2017) (resolving a claim "backed by substantial and uncontroverted evidence").

32. [Juara] has failed to present any contemporaneous evidence to substantiate his claim that he would have pleaded not guilty and insisted on going to trial if his plea counsel had advised him differently.

33. [Juara] has failed to prove that he would have pleaded not guilty and insisted on going to trial if his plea counsel had advised him differently.

34. [Juara] has failed to prove that deportation was his primary concern at the time of his guilty plea.

35. [Juara] has failed to prove that his plea of guilty was involuntary due to ineffective assistance of counsel.

36. [Juara] has failed to overcome the presumption that his plea was regular.

37. [Juara]'s plea was intelligently, knowingly[,] and voluntarily given. *See Ex parte Aguilera*, 540 S.W.3d 239, 249–52 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (When the evidence shows that applicant did not express immigration concerns to counsel before pleading guilty despite multiple immigration warnings from counsel,

The trial court's findings are exhaustive. They address the types of evidence that *Munoz* identified as germane to the prejudice question. 2020 WL 1584480, at *6–7. The findings note the admonishments given at the time of Juara's plea—admonishments that he would only grudgingly acknowledge. The findings address Juara's connections to the United States and the impact that deportation would have on those connections. The findings address the strength of the State's case against Juara on the possession charge. Overall, the findings involve the resolution of issues of historical fact and credibility in determining what Juara's state of mind was when he pleaded guilty—the type of findings to which we must defer. *See Torres*, 483 S.W.3d at 42.

In an attempt to overcome the deference that we must accord to the trial court's credibility findings, Juara's arguments try to shift the focus from contentions that the trial court's findings incorrectly weighed the evidence to contentions that the trial court misapplied the law or applied the wrong law, errors that are subject to a de novo review. Juara claims that the trial court applied too narrow a standard to the prejudice determination. This focus is demonstrated most clearly in Juara's reply brief when he summarizes his attack on the trial court's approach as follows:

> In deciding that Juara had not shown *Strickland* prejudice either, the district court reasoned only that "contemporaneous evidence"—

there were no allegations that applicant had a defense to the underlying charge, and there was no evidence that another plea deal could have avoided negative immigration consequences, applicant failed to prove that he was prejudiced by counsel's immigration advice.).

24

evidence that at the time of his plea, deportation was a primary concern—did not support Juara's claim that he would not have pleaded guilty absent his counsel's deficient performance. This too was erroneous. The court should have looked to the totality of the circumstances: among other things, Juara's "connection to the United States." [Record references and citations omitted.]

This argument is not correct factually and cannot distract from the fact that Juara's trial strategy opened his credibility to question on whether it was indeed reasonably probable that he would not have pleaded guilty had he received proper counsel.

First, Juara takes a categorical approach in his claim about what information he was given about the immigration consequences of his guilty plea; he contends that immigration was never mentioned to him by his plea counsel and that he had no idea that he might be deported as a result of a guilty plea until after he had entered that plea. As a consequence of this strategy, Juara's credibility became the central focus of the trial court's determinations. And that credibility was undermined both by his plea counsel's testimony that he had informed Juara of potentially grave immigration consequences from his plea and by Juara's grudging acknowledgement that when he made his plea, the trial court had also raised the question of his immigration status. The question that Juara leaves unanswered is why this blow to his credibility would not also cast doubt on the credibility of his claim that had he known the correct immigration consequences of his plea, he would not have pleaded guilty. Juara's all-or-nothing trial strategy carried the inherent risk of making his credibility the central

25

focus of his claim of prejudice; his effort to back away from that strategy comes too late.

Second, the specific attacks that Juara makes on the trial court's rejection of his prejudice claim are also unavailing:

- As we interpret Juara's brief, he appears to contend that the trial court failed to consider the totality of the circumstances in making its prejudice determination. The circumstances that he contends the trial court ignored were his connections to the United States. This argument is unsustainable in light of the following findings:

  > 40. Aside from stating that a few of his family members live in the United States, [Juara] never explained why deportation is a particularly severe consequence for him.
  >
  > 41. [Juara] testified that members of his family have gone back to India to visit.
  >
  > 42. [Juara] never claimed that he would be unable to see his family if he were deported. [Record references omitted.]

  It was Juara's decision regarding the evidence that he presented and the emphasis he placed on his connections to the United States. The trial court exercised its discretion on the weight to be given Juara's connections in view of this decision. It is not our role to second-guess that balancing. *See Salim*, 595 S.W.3d at 854.

- Juara appears to claim that the trial court erred by finding that

26

> [his] decision to not consult an immigration attorney despite being advised multiple times that he should do so to be fully aware of the immigration consequences of his plea is evidence that [Juara] was not as concerned with deportation at the time of his plea as he now claims.

Juara challenges this finding by claiming that there is evidence that he consulted with immigration counsel. Thus, he faults the trial court for not finding that he had even more knowledge of the immigration consequences of his plea than the trial court attributed to him in the findings. How the claim—that the trial court failed to make a finding more hurtful than the one actually made—advances his argument is unknown.

- Juara attacks the findings because

> [t]he court also should have considered that Juara spoke almost no English at the time of his plea. As Juara explained at the evidentiary hearing on his habeas application, *that's* why he did not stress that immigration consequences (or anything else, for that matter) were a particular concern.

Juara again ignores the record and argues that the trial court and this court should take his language-barrier claim at face value. Specifically, Juara ignores how the record undermines his slant. For example, the following exchange occurred during the State's cross-examination of Juara:

27

Q. Do you remember when the judge -- we were talking about when the judge asked you where you're from, you told him you were from India?

A. Yes.

Q. What did he tell you after that?

A. (No response.)

Q. Did he tell you that there might be immigration consequences if you plead guilty?

A. Yes, sir. Yeah, I do remember now.

Q. Did he tell you that he might be -- that you might be deported?

A. Yes, sir.

Q. Did you speak up at the hearing and say that you did not want to be deported?

A. What [do] you mean?

Q. Did you speak up at the hearing and tell the judge that you did not want to be deported?

A. There was no statement because I don't -- don't speak English.

Q. But you understood that you could be deported because that's what the judge told you, right?

A. Yes, sir.

The inherent contradiction—between a claim that he was ignorant of what occurred because of a language barrier and the acknowledgment that he understood what the plea court was telling him—is apparent.

28

The record supports the finding that Juara understood the trial court's admonishments and that he was not caught unaware of what was occurring at the plea hearing because of a language barrier.

Finally, Juara condemns the State for arguing that a lack of contemporaneous evidence dooms his prejudice argument. Juara argues that he had no burden to present any contemporaneous evidence and cites *United States v. Knight* as support for this proposition. 981 F.3d 1095, 1102 (D.C. Cir. 2020). Juara plucks a sentence out of a quote in *Knight* that in full context reads as follows:

> At least where a defendant has ple[aded] guilty and is seeking to show a reasonable probability that he would have gone to trial but for counsel's ineffectiveness, the Supreme Court has instructed that "[j]udges should . . . look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee*, 137 S. Ct. at 1967. Knight and Thorpe do not suggest that this principle is inapplicable in their circumstances. *Nonetheless, although contemporaneous evidence of the defendant's preferences may inform the prejudice inquiry, a defendant is not required to have hypothesized, at the time of the plea offer, that his attorney might be providing inadequate assistance and state that his decision whether or not to accept a plea offer would change if that were so.* [*United States v.*] *Aguiar*, 894 F.3d [351,] 362 [(D.C. Cir. 2018)].

*Id.* Just quoting the italicized sentence, Juara argues that the trial court erred by "concluding that the lack of contemporaneous evidence was dispositive."

As the full quote demonstrates, courts should look to contemporaneous evidence. Why the trial court should be criticized for doing so here is unclear. It appears from the language quoted by Juara that *Knight* would not require a defendant to present formulaic testimony that hypothesized he was being given erroneous advice at the time of his plea, but Juara cites no finding or conclusion indicating that the trial

29

court in this case required such formulaic proof. What the trial court did require was persuasive proof that at the time of the plea hearing, it was reasonably probable that Juara would have not pleaded guilty had he known that deportation would result from that plea. Here, the trial court exhaustively analyzed the evidence and found that it did not support Juara's *post hoc* assertion that even certainty of deportation would have altered his decision to plead guilty.

We overrule Juara's second issue.[4]

## IV. Conclusion

Having overruled Juara's dispositive second issue challenging the trial court's adverse resolution of the prejudice requirement to support his ineffective-assistance-of-counsel claim, we affirm the trial court's order denying habeas relief.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 9, 2021

---

[4]Because Juara has not met one of the two prongs of the *Strickland* test, we need not address Juara's first issue claiming that the trial court erred when it found that the representation that Juara had received from plea counsel was not deficient. *See* Tex. R. App. P. 47.1; *Strickland*, 466 U.S. at 697, 104 S. Ct. at 206.